**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MOHAMMED NAZIR BIN LEP,<br><br>                    *Petitioner*,<br><br>     *v.*<br><br>DONALD TRUMP,<br>1600 Pennsylvania Ave. NW<br>Washington, DC 20500;<br><br>MARK ESPER<br>1000 Defense Pentagon<br>Washington, DC 20301;<br><br>JEFFREY WOOD<br>4800 Mark Center Drive<br>Suite 11F09-02<br>Alexandria, VA 22350;<br><br>BG MARK MARTINS<br>1610 Defense Pentagon<br>Washington, DC 20301; and<br><br>RDML TIMOTHY KUEHHAS<br>U.S. Southern Command<br>9301 NW 33rd Street<br>Doral, FL 33172,<br><br>                   *Respondents*. | CIVIL ACTION<br>(HABEAS CORPUS)<br><br>No. _____<br>Misc. No. 08-mc-442 (TFH)<br><br>   *before*<br>   Judge John Bates |


**PETITION
FOR A WRIT OF HABEAS CORPUS**

**INTRODUCTION**

1.      Petitioner, Mohammed Nazir bin Lep, is a detainee at the U.S. Naval Station in Guantanamo Bay, Cuba. He has been held for over seventeen years in U.S. custody without trial. In that time, he has been subjected to extreme forms of torture and abuse, euphemistically called "enhanced interrogation techniques," that in turn, have been used to designate him as a "High Value Detainee" and to subject him to unlawful and extraordinary constraints on his conditions of confinement.

2.      For the past decade, Respondents have openly threatened Petitioner with prosecution before a military commission and publicly released the first of two different sets of military commission charges against him in 2017. Yet, Respondents have refused to actually convene a military commission to try those or any other charges, leaving Petitioner in a perpetual state of limbo and prejudice. Due to Respondents' bad faith delay, relevant witnesses have died, exculpatory evidence has become unavailable, and Respondents have sought to leverage the passage of time to permanently prejudice Petitioner's ability to defend himself. The long duration that the Government has detained Petitioner without notifying him of the actual charges against him, while also precluding access to the procedural and evidentiary rights available under the Military Commissions Act, is inexcusable.

3.      Petitioner disputes in the strongest possible terms Respondents' allegations against him, that he was or still is an enemy combatant, and that his detention is lawful. After seventeen years, Petitioner therefore petitions this Court for relief via *habeas corpus*.

**RELATED CASES**

4.      Petitioner has filed two prior habeas petitions in this Court, Case Nos. 09-cv-00031 and 19-cv-02799. Both were dismissed without prejudice to any claim raised herein.

1

**JURISDICTION**

5.      Petitioner brings this action pursuant to 28 U.S.C. §§ 2241 and 2242. This Court has jurisdiction over the subject-matter pursuant to 10 U.S.C. § 950p(c), 28 U.S.C. §§ 1331, 50 U.S.C. §§ 1541, *et seq.*, the Authorization for Use of Military Force ("AUMF"), 115 Stat. 224 (2001) (codified at 50 U.S.C. § 1541, note), Article I § 8, cl. 11, Article II § 2, cl. 1, Article III § 2, cl. 3, the Fifth Amendment, the Sixth Amendment, and Eighth Amendment.

6.      This Court has authority under 28 U.S.C. § 2241 to grant the writ of *habeas corpus*. Pursuant to 28 U.S.C. § 2201, this Court has authority to declare the rights and other legal relations of the parties herein. Pursuant to 28 U.S.C. §§ 1651 and 2202, this Court has the authority to effectuate and enforce its judgments by all necessary and proper means, as this case involves an actual controversy within the Court's jurisdiction.

**VENUE**

7.      Venue is proper in the United States District Court for the District of Columbia, since at least one respondent resides in the district, a substantial part of the events or omissions giving rise to the claim occurred in the district, at least one respondent may be found in the district, and all respondents are either officers or employees of the United States or any agency thereof acting in their official capacities. *See* 28 U.S.C. §§ 1391(b), 1391(e).

**THE PARTIES**

8.      Petitioner Mohammed Nazir Bin Lep is a forty-three (43) year-old citizen of Malaysia. He is a civilian and not an enemy combatant. He was seized by local authorities in Thailand on or around August 13, 2003, and was subsequently transferred to the custody of the Central Intelligence Agency ("CIA"). On or around September 6, 2006, President George W. Bush announced that fourteen detainees, who had been held in secret CIA prisons, had been

transferred into the custody of the U.S. Department of Defense ("DOD") at the Guantanamo Bay Naval Station ("Guantanamo Bay") in Guantanamo Bay, Cuba. Mr. Bin Lep is one of these detainees. Petitioner is detained without lawful basis and in violation of the Constitution, laws, and treaties of the United States and international law.

9. Respondent, Donald Trump, is a citizen of the United States and is named in his official capacity as President of the United States. As President, he is made the Commander-in-Chief of the armed forces, is given diverse statutory powers over Petitioner's detention and treatment, and is his ultimate custodian.

10. Respondent, Mark Esper, is a citizen of the United States and is named in his official capacity as Secretary of Defense. As Secretary of Defense, he has been delegated significant supervisory discretion over Petitioner's detention and treatment, and therefore exercises the powers of custodian. Respondent Esper is also the convening authority for all military commissions pursuant to 10 U.S.C. § 948h.

11. Respondent, Jeffrey Wood, is a citizen of the United States and is named in his official capacity as the designated Convening Authority for military commissions by Respondent Esper pursuant to 10 U.S.C. § 948h. The Convening Authority is responsible for the overall management of the military commissions process, including convening military commissions, referring charges to trial, negotiating pre-trial agreements, reviewing trial records, and overseeing logistics and personnel issues related to Petitioner's case both before and after referral of the case to a military commission. The Convening Authority also has the authority and is responsible to provide resources to commission defendants necessary and appropriate to enable them to participate in and to present a meaningful defense to charges brought against them.

12. Respondent, Brigadier General Mark Martins, Judge Advocate General's Corps, U.S. Army, is a citizen of the United States and is named in his official capacity as the Chief Prosecutor for the Office of Military Commissions. As Chief Prosecutor, he is responsible for the conduct of all military commission charges and prosecutions.

13. Respondent, Rear Admiral Timothy Kuehhas, U.S. Navy, is a citizen of the United States and is named in his official capacity as the Commander of Joint Task Force Guantanamo, which runs the detention operation at Guantanamo Bay.

14. Respondents are directly responsible for any activities undertaken by or under the supervision of any agents or employees acting on their behalf or of agents or employees of private contractors with whom any agency under Respondents' authority or supervision has contracted for the provision of services. All references to Respondents' actions in this Petition include activities performed by Respondents' agents or employees, other government agents, or employees or contractor employees.

<strong>BACKGROUND</strong>

**PETITIONER'S INITIAL DETENTION**

15. Mohammed Nazir Bin Lep is a Malaysian citizen born on December 26, 1976.

16. During the late 1990s there was significant sectarian violence in Indonesia, news of which spread widely throughout the region, including to Malaysia. Respondents allege that while Petitioner was attending religious services in Malaysia, he met an Indonesian man named Encep Nurjaman (aka Hambali), who was allegedly a leader in the Southeast Asian terrorist group Jemaah Islamiyah. Hambali allegedly advised Petitioner that if the Petitioner wanted to protect Muslims, he should go to Afghanistan for training. Hambali also allegedly arranged for Petitioner to travel to Afghanistan in or around June 2000, where Petitioner allegedly received

4

basic military training at an al Qaeda connected training camp. Petitioner allegedly returned to Southeast Asia in 2001.

17. On or around August 11, 2003, Petitioner was arrested in Thailand by local authorities, and at some point thereafter, transferred to CIA custody. For the next three years, he was held incommunicado in secret "black sites" as part of the CIA's Rendition Detention and Interrogation ("RDI") Program. During this time, CIA agents subjected Petitioner to extreme forms of torture and abuse despite the fact that he was cooperative and determined at the time to be of "limited value." *See* Senate Report No. 113-288 (2014) (*Senate Select Committee on Intelligence Committee Study of the Central Intelligence Agency's Detention and Interrogation Program* - unclassified summary*)*. Petitioner's torture was continued despite—and apparently justified because of—the CIA's own failure to hire a Malay translator. "CIA officers later suggested that the misleading answers and resistance to interrogation that CIA interrogators cited in their requests to use the CIA's enhanced interrogation techniques against … [Petitioner], may not have been resistance to interrogation, but rather the result of issues related to culture and [his] poor English language skills." *Id*. at 109 n.634.

18. On September 1, 2006, the CIA and DOD entered into a Memorandum of Agreement regarding the detention of prisoners then in CIA custody, including Petitioner. Later that month, Petitioner was transferred into the custody of the DOD at Guantanamo Bay. After the CIA detainees arrived at the U.S. military base at Guantanamo Bay, they remained under the operational control of the CIA, and were housed in a separate building from other U.S. military detainees known as "Camp 7." This facility is used to house the so-called "High Value Detainees" ("HVD"), a category based upon an individual having been subjected to the CIA's use of enhanced interrogation techniques.

19. Respondents' designation of Petitioner as an HVD has a direct impact on his access to counsel and his conditions of confinement. The attorneys and staff of HVDs require TS/SCI/SAP clearances to meet their clients, and must comply with separate and more onerous handling requirements under this Court's protective order than those which govern counsel for Low Value Detainees ("LVD"), for whose counsel only SECRET clearances are required. *See*, *e.g.*, Amended Protective Order for Habeas Cases Involving Top Secret/Sensitive Compartmented Information and Procedures for Counsel Access to Detainees at the United States Naval Station in Guantanamo Bay, Cuba, in Habeas Cases Involving Top Secret/Sensitive Compartmented Information, Case Nos. 08-MC-442-TFH (Dkt. Nos. 1481 and 1496) & 08-cv-01207-RJR (Dkt. Nos. 79 & 80) (D.D.C., Jan. 9, 2009). The conditions of confinement in Camp 7 are much harsher than those in camps used to house LVDs. In fact, the Government has insisted on more restrictive conditions on Petitioner's contact with family members, which is extremely limited and mediated through unreliable technology, all on the basis that Petitioner is being held as an HVD.

20. A Combatant Status Review Tribunal ("CSRT") was convened on March 20, 2007. Relying principally on alleged confessions that Petitioner and others made under "enhanced interrogation," Respondents designated Petitioner as an "enemy combatant." Petitioner was not present for any portion of the hearing and had no legal counsel representing him. No publicly available document memorializes the final decision of the CSRT as to the reasons for Petitioner's designation as an enemy combatant.

21. Petitioner had been detained without charge for more than five years when, on January 7, 2009, then counsel for Petitioner filed a Petition for a Writ of Habeas Corpus in this Court. That Petition challenged the legality of Petitioner's detention without trial or due process,

including the lack of a meaningful opportunity to be heard to contest the legality of his detention, asserting as his third ground for relief that he "continues to be detained without charge" in violation of his "Fifth and Sixth Amendment rights." *Bin Lep v. Bush*, Case No. 09-cv-0031, Petition for a Writ of Habeas Corpus ¶¶ 77-78 (D.D.C., Jan. 7, 2009). In presenting that Petition, Petitioner was represented by attorneys from the Office of the Federal Public Defender for the Eastern District of Virginia. On April 5, 2013, this Court entered a Stipulation and Order dismissing the petition without prejudice, and granting Petitioner continued access to habeas counsel along with the right to seek further relief by *habeas corpus*.

**CRIMINAL CHARGES WITHIN THE MILITARY COMMISSIONS PROCESS**

22. Upon taking office, President Barack Obama established an interagency task force to make recommendations concerning the disposition of the detainees still held in Guantanamo. This task force was led and directed, in part, by Respondent Martins, who has presided as the Chief Prosecutor for the Office of Military Commissions since 2011. As early as January 22, 2010, the task force recommended that the Obama Administration treat Petitioner as a target for potential prosecution. *See* Guantanamo Review Dispositions (undated) *available at* https://perma.cc/23H5-5ZXP. At no point for the remainder of the Obama Administration, however, were any charges levied or was a prosecution commenced against Petitioner.

23. On June 21, 2017, the Office of the Chief Prosecutor swore charges against Hambali, who is detained in Guantanamo Bay. These charges focused on Hambali's alleged orchestration of bombings in Bali and Jakarta, Indonesia. These charges did not include Petitioner and were never referred to a military commission.

24. Respondents first swore charges against Petitioner on December 7, 2017. These charges alleged that Petitioner was criminally responsible for providing support to Hambali in

the Jakarta attacks. Hambali and another Guantanamo Bay detainee, Mr. Mohammed Farik Bin Amin (aka "Zubair"), were also named in these charges. The Office of the Chief Prosecutor levied these charges more than fourteen years after Petitioner was first taken into U.S. custody. No military commission was convened to proceed on these charges, however, and on October 10, 2019, the Convening Authority dismissed these charges without prejudice.

25. On April 5, 2019, the Office of the Chief Prosecutor swore a second set of charges against Petitioner, Zubair, and Hambali. This set of sworn charges included similar alleged offenses against Petitioner as the previous charges but also included an additional and vaguely worded charge of conspiracy encompassing any and all illegal activity triable by military commission from 1996 through 2003 pursuant to 10 U.S.C. § 950t(29). The Office of the Chief Prosecutor forwarded the newly-sworn charges to the Convening Authority on October 8, 2019, and the Convening Authority has taken no action since that time.

26. The Office of the Chief Prosecutor and the Convening Authority have declined to inform Petitioner's counsel why each iteration of the sworn charges has been found deficient, or why the Convening Authority has declined to refer charges to a military commission. This inaction and silence have continued after Respondent Wood replaced Mr. Christian Reismeier as the Convening Authority on April 17, 2020.

27. As a result of Respondents' delay in referring charges against Petitioner, significant exculpatory evidence relating to these charges has been lost. Specifically, numerous key witnesses have died in the years following Petitioner's initial detention. A key leader of the Bali attack, Ali Ghufron (aka "Muklas"), was executed in November 2008 by the Indonesian government. Two others, Imam Samudra and Amrozi, were executed with him. Dr. Azahari Husin, a bombmaker who allegedly contributed to both the Bali and Jakarta attacks, was killed

by Indonesian law enforcement in 2005. Noordin Top, the alleged leader of the Jakarta attack, was killed by Indonesian law enforcement in 2009. Dulmatin, another alleged key leader in the Bali attack, was killed by Indonesian law enforcement in 2010. In addition, Faiz Bafana, an allegedly key financial and logistics planner for Jemaah Islamiyah, died of natural causes in 2008 after having previously been incarcerated. Any of these individuals would have stated that Petitioner had nothing to do with the attacks and could have provided significant exculpatory evidence on his behalf.

28. Throughout his years in U.S. detention with limited access to legal resources, Petitioner had no effective means to obtain the now permanently lost exculpatory evidence. There is no substitute for this evidence, which was lost due to the Respondents' unreasonable and ongoing delay in referring charges against Petitioner after over seventeen years in U.S. custody. To be clear, nothing stopped Respondents at any point from accessing this potential evidence.

29. As a practical matter, Petitioner's current legal team has been denied the ability to travel to Indonesia in order to speak with witnesses and investigate the case. Conversely, Respondents were able to visit with witnesses in Indonesia and still have the ability to do so given that they maintain personnel in the country.

30. Petitioner's legal team has also been prevented from speaking with any of the still living witnesses in the case, many of whom are under the control of local government authorities. For instance, one of the key witnesses made it known to a third party that he is interested in speaking to Petitioner's counsel. However, this witness and others are precluded from doing so by local law enforcement authorities. These authorities told Petitioner's counsel that the Federal Bureau of Investigation ("FBI") would need to provide permission for the

interviews to be conducted. The local FBI officials demurred, however, and referred Petitioner's counsel to the Office of the Chief Prosecutor. Upon a request from Petitioner's counsel to assist in procuring witness interviews, the lead prosecutor refused to provide help, stating the U.S. government would not facilitate Petitioner's efforts absent referred charges.

31. Petitioner's counsel is aware of previous plea negotiations that have taken place between Respondents and representatives for Zubair. *See* Charlie Savage, *Guantánamo Deal Could Lead to Prosecution in Indonesia Terrorist Attacks*, N.Y. Times, November 12, 2016. The current state of such negotiations is unknown to Petitioner and his counsel.

32. One of Petitioner's counsel also can represent that he has information to suggest that Respondents have intentionally delayed initiating proceedings against Petitioner as part of a continuing effort to develop potentially inculpatory evidence against him and his alleged co-conspirators and to conceal classified evidence from Petitioner's trial counsel that is potentially exculpatory. The means by which Respondents have operated have not been disclosed to Petitioner's trial counsel due to Petitioner's lack of discovery rights in the absence of referred military commissions charges. Were Petitioner's trial counsel aware of the steps Respondents have taken since the swearing of charges to secure inculpatory evidence, Petitioner's counsel could respond and endeavor to mitigate the potential risks to Petitioner's rights. The member of Petitioner's legal team with knowledge of this information is presently subject to a protective order issued in a military commissions case in which the disclosure was made and thus, cannot disclose the basis of this conclusion to Petitioner's other counsel, or even Petitioner, absent a specific order to do so from this Court.

33.     On September 10, 2018, the Office of the Chief Prosecutor requested that the Convening Authority initiate classified pre-referral proceedings against Petitioner. At that point, Petitioner's trial team had no investigative staff, and both of his military attorneys were scheduled to leave the team in the months to follow. By June 2019, Petitioner was detailed three new trial attorneys and one investigator from the Military Commissions Defense Organization ("MCDO"). However, this was still insufficient for the proposed proceedings, and the Convening Authority denied Petitioner's multiple requests for additional counsel and resources.

34.     The Office of the Chief Prosecutor did provide Petitioner's MCDO trial counsel with the evidence the Office of the Chief Prosecutor deemed relevant to the classified proceeding. This evidence was almost exclusively obtained prior to 2009. As this Court heard, however, Petitioner's repeated requests for additional discovery and exculpatory evidence were denied on the basis of the prosecution's position that such requests were invalid under the Rules for Military Commissions ("RMC"). Respondents also denied Petitioner's counsel the ability to use classified evidence at the classified proceeding.

35.     After encountering significant and insurmountable legal, logistical, resource-related, and other Respondent-imposed obstacles, Petitioner's MCDO counsel determined that they were unable to participate competently in these pre-referral proceedings. Specifically, Petitioner's lead attorney had been on the case for less than three months, as had Petitioner's only investigator. Conversely, Respondents had been investigating Petitioner's case for nearly two decades, and had an experienced team of multiple attorneys.

36.     Because of the aforementioned impediments, Petitioner filed a classified motion to enjoin the proceedings on September 17, 2019. This Court granted that motion on September

20, 2019, issuing its opinion on September 23, 2019. After further hearings before this Court, the petition was dismissed as moot on November 26, 2019.

37. Following this Court's decision, Respondents cut off any funding for MCDO personnel to travel on Petitioner's behalf. This included critical investigative trips that could not be replicated through telephonic or remote means. Therefore, Petitioner was deprived of additional exculpatory evidence which could have been presented in this petition or at other judicial proceedings. *See* Exhibit 1. Petitioner's counsel also requested that the Convening Authority provide resources to hire foreign counsel to facilitate the investigation. *See* Exhibit 2. This request would have significantly lessened the need for Petitioner's counsel to travel, and allowed the case to continue to develop over the past seven months during the coronavirus outbreak, when international travel was largely precluded. Unfortunately, the Convening Authority denied this request as well. *See* Exhibit 3.

**PERIODIC REVIEW BOARD PROCEEDINGS**

38. The U.S. Government's Periodic Review Board ("PRB") process is a discretionary, administrative interagency process to review whether continued detention of particular individuals held at Guantanamo Bay remains necessary to protect against a continuing significant threat to the security of the United States. This PRB process was established by Executive Order 13567, dated March 7, 2011, and is conducted in conformance with section 1023 of the National Defense Authorization Act ("NDAA") for the Fiscal Year 2012. The PRB includes a cross-section of the national security community. The PRB decision-making panel consists of one senior official from: the U.S. Departments of Defense, Homeland Security, Justice, and State; the Joint Staff; and the Office of the Director of National Intelligence.

39. The PRB process does not address the legality of any individual's detention under the AUMF as informed by the laws of war. The PRB instead is tasked with determining whether "law of war detention remains necessary to protect against a continuing significant threat to the security of the United States." The PRB can recommend continued law of war detention or recommend a detainee's transfer, including establishing the conditions for such a transfer.

40. In making its assessment, the PRB reviews relevant information in the detainee disposition recommendations from the Guantanamo Review Task Force (established by Executive Order 13492 on January 22, 2009), the work product of any prior PRB, the stated intentions of the Office of the Chief Prosecutor with regard to prosecution of the detainee by military commission, and any additional relevant information that has become available. The PRB also may consider diplomatic matters or security assurances related to the detainee's potential transfer. The PRB receives and takes into account all mitigating information relevant to whether the detainee poses a continuing significant threat, including information provided on behalf of the detainee.

41. The PRB conducts a full review of each detainee, including inviting the detainee to participate in the PRB hearing, every three years. In the intervening period, the PRB conducts file reviews every six months for any detainee for whom the PRB has determined that continued detention is necessary. These reviews focus on any new information or changed circumstances that the PRB should consider.

42. Petitioner's first full review occurred in August 2016. Petitioner was not represented by counsel at his first PRB, as his current *pro bono* counsel at Arnold & Porter started representing him a few months later. Petitioner participated in this full review, including answering questions posed to him by the PRB members during the classified hearing. In its

Unclassified Summary of Final Determination on September 15, 2016, the PRB "recognize[d] the detainee's general candor regarding his past activities and his acknowledgement of the challenges he would face in staying away from reengagement possibilities." Exhibit 4.

43. As part of his first full review, Petitioner's "Personal Representative," who was a uniformed military officer relied upon Respondents to communicate with Petitioner during the PRB process, wrote to the PRB at the time that Petitioner "has been willing to participate with us" and "has treated us with respect since our first meeting." Exhibit 5. The Personal Representative informed the PRB that Petitioner "would prefer to return to Malaysia and be willing to participate in any rehabilitation program that would help in allowing his transfer to occur." *Id*. The Personal Representative also stated that Petitioner "has been a highly-compliant detainee with few disciplinary infractions. He participated in the Detainee Socialization Management Program (DSMP), while it was instituted in his camp. He has told us that he is not a threat to America, and his mindset has changed, since the time before his capture. If he were released, he would say good-bye to his old life, because he feels that he has lost so much since he has been detained (his parents, an older sister and friends)." *Id*.

44. The PRB approved the continued detention of Petitioner, and identified its concern with "the complete lack of independent information regarding the views, willingness, and ability of the detainee's family to support him upon transfer and/or a potential rehabilitation program available to him" and "the lack of supporting evidence of a change in the detainee's mindset." Exhibit 4. Nonetheless, the PRB stated that it "looks forward to reviewing the detainee's file in six months and strongly encourages that efforts be made on his behalf to engage with his family and Malaysian government officials with regard to what would be in place if the detainee was transferred." *Ibid*.

14

45.     Petitioner subsequently obtained his current *pro bono* counsel to represent him in these periodic reviews, including through the development and submission of the supporting evidence requested by his initial PRB. In March 2017, Petitioner provided the PRB with a letter from Petitioner's family members stating that they wished to be reunited with him, that they would welcome him with deep love and affection, and that they could provide him with all necessary support, including housing, employment, and the property he inherited since his mother passed away during his detention. Petitioner also informed the PRB that his counsel had met with members of Malaysia's diplomatic mission in the United States, who expressed their government's strong interest in Petitioner's return home as well as their willingness to work with the U.S. Government to develop a plan for his transfer to Malaysia. Petitioner also provided the PRB with detailed information on the Malaysian government's comprehensive de-radicalization program, in which Petitioner pledged to participate as part of his potential transfer from Guantanamo Bay. Throughout his detention, Petitioner has maintained contact with his family in Malaysia. He hopes to be transferred back to Malaysia and to be reunited with his family so that he can establish a peaceful and productive life there.

46.     The Office of the Chief Prosecutor, however, soon intervened to undercut the PRB's review of Petitioner's potential transfer from U.S. custody. Respondent Martins submitted letters asking that Petitioner not be transferred because of the sworn military commissions charges that remain pending against him. In his June 28, 2018 letter to the PRB, for example, the Respondent Martins stated that:

> 1. Section 1023(b)(4)(D) of the National Defense Authorization Act for fiscal year 2012 requires that, in conducting its periodic review of detention, the Board consider, *inter alia*, the likelihood that a detainee may be subject to trial by military commission. The below prosecutorial position is provided to fulfill this requirement.

15

> 2. I have no concerns about the lawfulness of [Petitioner's] detention under the law of armed conflict and also believe that continuing humane, secure, and legitimate detention under the law of armed conflict is a course of action completely consistent with the national security and justice interests of the United States. I have sworn charges against [Petitioner].

Exhibit 6.

47.     Respondent Martins' and the Office of the Chief Prosecutor's repeated representations to the PRB that there were sworn charges against Petitioner, which the PRB must factor into its assessment of whether to recommend Petitioner's transfer out of Guantanamo Bay, has prevented the PRB from fairly considering whether Petitioner's continued detention remains necessary. The continuing threat of criminal proceedings in a military commission also prejudices Petitioner's ability to fully participate in the PRB proceedings, since any evidence he offers to the PRB regarding his history or current outlook may later be offered against him at a military commission trial.

48.     For Petitioner's second full review in June 2019, his counsel wrote to the PRB on his behalf in support of Petitioner's continuing request to be transferred from detention at Guantanamo Bay. Petitioner's counsel emphasized that Petitioner harbored no ill-will or malice toward the United States, that his family members residing in Malaysia had strongly and repeatedly expressed their desire to welcome him home, and that the Malaysian government remained eager and willing to coordinate the terms of his transfer to Malaysian custody with the U.S. Government.

49.     Because of the sworn charges that remain pending against him, however, Petitioner was forced to decide against participating personally in the PRB's hearing in June 2019. Thus, the sworn, but un-referred charges against him continue to hamstring Petitioner's

ability to fully participate in the PRB process. Outside of *habeas corpus*, the PRB is Petitioner's only available avenue to contest his detention and pursue his transfer or release.

**DENIAL OF HABEAS RIGHTS**

50.     The pendency of sworn charges has also continued to chill Petitioner's ability to litigate his habeas claims, as Petitioner's counsel must consider his future liability and potential prejudice in a military commissions prosecution. Specifically, while there are litigable habeas claims that Petitioner may be able to exercise before this Court, to include challenging his very designation as an "enemy combatant," actually litigating these claims could undermine his ability to mount related defenses before a military commission. This is further compounded by the indeterminate nature of the charges and the lack of discovery rights accorded to Petitioner.

51.     Additionally, the pendency of sworn charges has impaired the Petitioner's ability to investigate his case. Specifically, Petitioner's access to numerous witnesses, who could help him rebut Respondents' contention that he is detainable under the AUMF, has effectively been denied due to Respondents' interest in pursuing military commissions charges. Were these charges not on the table, Petitioner's counsel would be able to meet with and interview these witnesses, and to use their testimony before this Court in a habeas proceeding (or, for that matter, before a PRB). Given the number of witnesses who are now permanently unavailable, and the likelihood that additional witnesses and exculpatory information will become lost or spoiled, the prejudice of the ongoing arbitrary delay caused by Respondents continues to ripen.

52.     Furthermore, the pendency of sworn charges arbitrarily interferes with Petitioner's ability to eventually be released from Guantanamo following a successful PRB, diplomatic negotiation, or habeas proceeding. Respondents have made repeated assertions that a crucial element in releasing any detainee is that they no longer constitute an ongoing threat to the

United States. One element of this is that there is a foreign country willing and ready to accept the detainee. However, repatriation discussions with the Malaysian government have effectively stalled, due in large part to the pending sworn charges. Were these charges not in place, such discussions could advance on a more concrete and productive timeline.

**DENIAL OF ADEQUATE MEDICAL CARE**

53.     Petitioner's counsel has also sought to obtain medical relief and potential repatriation for Petitioner. U.S. Army Regulation 190-8, which is applicable across all military branches, requires the repatriation of sick or wounded prisoners as deemed necessary by a medical commission. This Court has held that this regulation applies to Guantanamo detainees such as Petitioner. *See Al-Qahtani v. Trump*, 2020 U.S. Dist. LEXIS 39226 (D.D.C. 2020).

54.     Petitioner suffered physical and mental harm while in the custody of Respondents. This occurred during the three years he was subjected to torture at black sites in the RDI program, as well as in the subsequent fourteen years at Guantanamo Bay. Therefore, he is likely in need of the same independent medical commission that this Court ordered for similarly situated detainees. However, Petitioner's legal team does not employ anyone with the ability to evaluate Petitioner's medical conditions, and therefore is unable to assess the most appropriate basis for requesting a medical commission.

55.     The Convening Authority is the only source of funding available for Petitioner's legal team at the MCDO. As such, on March 4, 2020, Petitioner's counsel submitted a request to the Convening Authority to interview and hire medical personnel to evaluate Petitioner. *See* Exhibit 7. The Convening Authority denied the request for funding on May 30, 2020, claiming he had no ability to allocate such funds due to the lack of referred charges. *See* Exhibit 8.

56.     Without access to an expert to perform an in-person evaluation of Petitioner, Petitioner's legal team next attempted to obtain his medical records for review. However, despite repeated requests, Petitioner's counsel have been denied his records. Specifically, Petitioner's counsel requested his records from the Commander, Joint Task Force Guantanamo Bay, Cuba on June 26, 2020. *See* Exhibit 9. This request was denied on June 30, 2020. *See* Exhibit 10. Petitioner's counsel also requested his medical records from the Convening Authority on June 30, 2020. *See* Exhibit 11. This request was denied on July 14, 2020. *See* Exhibit 12. The military prosecutor was made aware of Petitioner's requests, but never took steps to assist. *See* Exhibit 13.

57.     As additional context for the Court, Petitioner understands that counsel for Hambali has also tried to obtain their client's medical records. Hambali's counsel submitted a Freedom of Information Act request two years ago, but has received no response. Military prosecutors have also denied Hambali's counsel's request for medical records, stating that such records are subject to the discovery provisions of the RMC. The prosecutors made this claim even though the sworn charges against Hambali and his alleged co-conspirators, including Petitioner, have not been referred, and so no military commission has yet been convened. *See* Exhibit 14. A similar request was made by Petitioner's legal team, and it was also denied by the prosecutors. *See* Exhibit 15.

**THE GUANTANAMO MILITARY COMMISSIONS' PROVEN IRREGULARITY**

58.     In the time that has elapsed since Petitioner's seizure, Respondents have convened approximately twenty-nine military commissions to charge dozens of defendants for various offenses under 10 U.S.C. § 821, and later, the MCA. These military commissions have been beset by legal and logistical difficulties, including a decision from the Supreme Court in 2006

19

invalidating them on the ground that "the rules specified for ... trial are illegal." *Hamdan v.*
*Rumsfeld*, 548 U.S. 557, 625 (2006).

59.     In that same time, hundreds of cases involving terrorism-related offenses have
been adjudicated in the regular Article III judicial system during the time that Petitioner has been
detained. "A citizen, no less than an alien, can be part of or supporting forces hostile to the
United States and coalition partners," *Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004) (internal
citation omitted), so it is not surprising that federal criminal prosecutions have led to the
convictions of at least 297 U.S. citizens in Article III courts since September 11, 2001. *See* U.S.
Dep't of Justice and U.S. Dep't Homeland Security, *Executive Order 13780: Protecting the*
*Nation From Foreign Terrorist Entry Into the United States: Initial Section 11 Report* (January
2018). According to the U.S. Department of Justice, federal prosecutors have prosecuted over
586 terrorism cases to conviction following the September 11 attacks and enactment of the
AUMF. U.S. Dep't of Justice, National Security Division, "Chart of Public/Unsealed
International Terrorism and Terrorism-Related Convictions" (April 20, 2018), *available at*
https://perma.cc/AX8N-REWJ. And at least 509 of those terrorism convictions were the result of
charges filed and tried to conclusion since Petitioner has been in U.S. custody. *Ibid.*

60.     On the other hand, the irregular military commissions process—which is available
to Respondents to try Petitioner based on his alienage but which cannot be used to try U.S.
citizens—has resulted in a total of eight convictions, six of which were obtained by guilty pleas.[1]

---

[1] One of those military commission convictions remains on post-trial appeal, though two
of the three charges underlying the defendants' conviction were unanimously vacated. *Bahlul v.*
*United States*, 767 F.3d 1 (D.C. Cir. 2014). Three of the other convictions were vacated on
appeal or dismissed. *Hicks v. United States*, 94 F. Supp. 3d 1241 (USCMCR 2015); "Findings
and sentence disapproved in US v. Noor Utham Mohammed," (Jan. 9, 2015), *available at*
https://perma.cc/PGR9-GSEM; *Hamdan v. United States*, 696 F.3d 1238 (D.C. Cir. 2012),
*overruled on other grounds by Al Bahlul*, 767 F.3d 1 (D.C. Cir. 2014).

Other military commissions proceedings where sworn charges have been referred, including those related to the 9/11 and U.S.S. COLE attacks where the pending charges were first sworn in 2011, are mired in pretrial litigation with no clear end in sight. Indeed, in the U.S.S. COLE case against Abd al-Rahim Al-Nashiri, four years of pretrial rulings were wiped out when the D.C. Circuit found that the presiding military judge's actions created a disqualifying appearance of partiality and that "save for Al-Nashiri's defense counsel, all elements of the military commission system—from the prosecution team to the Justice Department to the CMCR to the judge himself—failed" to live up to their "shared responsibility" for the commissions proceedings. *In re Al-Nashiri*, 921 F.3d 224, 239–40 (D.C. Cir. 2019).

61. Contrast this with the prosecution of terrorism offenses in the Article III system, where the prosecution and the court are governed by the Speedy Trial Act. According to the U.S. Department of Justice's National Security Division, there were 391 convictions in Article III courts between September 11, 2001 and December 31, 2017 for offenses that are facially connected to international terrorism, such as committing terrorist acts abroad against United States nationals (18 U.S.C. § 2332) or providing material support to terrorists (18 U.S.C. § 2339A) or designated terrorist organizations (18 U.S.C. § 2339B). Those cases took, on average, about 21 months from charging (whether by information, complaint, or indictment) to conviction, even including the full time in cases where the defendants were charged before they were apprehended, such as in the case of Abu Hamza al Masri, who was convicted of various terrorism charges over 10 years after his initial indictment but less than two years after he was extradited to the United States from the United Kingdom, "Mustafa Kamel Mustafa, A/k/a "Abu Hamza," Convicted Of 11 Terrorism Charges In Manhattan Federal Court," (May 19, 2014), *available at* https://perma.cc/H32B-RZGM. A similar case involved Babar Ahmed, who was

convicted nine years after indictment but only 14 months after his extradition to the United States. Federal Bureau of Investigation,"Two British Nationals Plead Guilty to Terrorism-Related Charges in New Haven Federal Court," (Dec. 10, 2013), *available at* https://perma.cc/W7XN-QMVF.

62.    As the U.S. Department of Justice's tally of terrorism convictions demonstrates, Article III courts have tried citizens and non-citizens for terrorism-related offenses—and without the excessive delays endemic to the military commissions system. *See, e.g., United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010); *United States v. Lindh*, 227 F.Supp.2d 565 (E.D. Va. 2002). Moreover, regular federal courts have tried a HVD transferred from Guantanamo Bay, Ahmed Ghailani, who had previously been held by the CIA and subjected to enhanced interrogation techniques just like Petitioner. *See United States v. Ghailani*, 733 F.3d 29, 39 (2d Cir. 2013). Although the Convening Authority referred military commissions charges against Ghailani and he was arraigned before a military judge in October 2008, President Obama suspended Ghailani's military commission and transferred him from Guantanamo Bay to the Southern District of New York to face charges in federal court in June 2009. *Id*. at 40. In November 2010, Ghailani was convicted of one count of conspiring to destroy United States buildings and property for his role in the bombings of the American embassies in Nairobi and Dar es Salaam. *Ibid*. He was sentenced to life in prison two months later. *Id*. at 41. And his conviction was affirmed in 2013. *Ibid*.

63.    The delay in Petitioner's case is almost six times as "substantial" as in Ghailani's case. Petitioner has been detained for over seventeen years (fourteen of which have been at Guantanamo Bay), living under the shadow of sworn commissions charges for almost three years, but he is no closer to a resolution of his case than the day he entered U.S. detention. Even

22

if the Government were to refer military commissions charges against him tomorrow, he will enjoy no guarantee of an expeditious trial as he would in the non-segregated Article III system. *See* 10 U.S.C. § 948b(d) (expressly denying the statutory speed trial right that otherwise exists at courts-martial to accused in military commissions).

64.     Exacerbating this delay, the RMC was amended in 2010 to explicitly preclude Petitioner's time in detention from serving as credit toward an eventual sentence. RMC 1001(c). This stands in stark contrast to the Rules for Court Martial ("RCM") upon which the RMC was based. RCM 1102(B)(2)(B) ("If the accused was earlier ordered into confinement…, the accused's sentence shall be credited one day for each day of confinement already served."). Respondents therefore have created an extra-judicial sentence of confinement in advance of trial that both exacerbates the harms that continued delay imposes upon Petitioner and perversely incentivizes Respondents to defer actual trial proceedings as long as possible.

**GROUNDS FOR RELIEF**

**Ground I**

**Violation of the Right to a Speedy Trial**

65.     Petitioner incorporates paragraphs 1 – 64 *supra*.

66.     Under the Sixth Amendment, anyone accused of a crime is entitled to a speedy trial. Where the government unreasonably delays a prosecution to the accused's prejudice, the government forfeits its constitutional power to prosecute.

67.     Respondents have held Petitioner without charge or trial for over seventeen years. For the past three years, Respondents have dangled the prospect of criminal prosecution before a military commission based upon allegations that could have been brought at any time over the past seventeen years of Petitioner's custody, or at a minimum, after his transfer to Guantanamo

Bay fourteen years ago, which coincided with the enactment of the MCA. This extraordinary and unreasonable delay has been perpetuated in bad faith and has prejudiced Petitioner's ability to defend himself against the allegations Respondents continue to threaten to levy against him, to include the wrongful denial of counsel, the loss of exculpatory evidence, and improper efforts to cultivate inculpatory evidence in violation of his Sixth Amendment right to a speedy trial.

## **Ground II**

### **Violation of the Right to Procedural Due Process**

68.    Petitioner incorporates paragraphs 1 – 67 *supra*.

69.    The Due Process Clause of the Fifth Amendment guarantees all persons whom the Government seeks to deprive of life, liberty, or property the right to notice and an opportunity to be heard.

70.    Respondents have held Petitioner without trial for over seventeen years. For the past three years, Respondents have dangled the prospect of criminal prosecution before a military commission based upon allegations that could have been brought at any time over the past seventeen years of Petitioner's custody, or at a minimum, after his transfer to Guantanamo Bay fourteen years ago, which coincided with the enactment of the MCA. The nature and scope of the charges have repeatedly changed, and to date remain uncertain, depriving Petitioner of notice of the liability Respondents seek to impose upon him. Respondents further have used delay to systematically and fatally prejudice Petitioner's ability to defend himself, depriving him of any meaningful right to be heard on the charges Respondents continue to threaten to bring against him.

**Violation of the Detainee Treatment Act, 42 U.S.C. § 2000dd; Military Commissions Act, 10 U.S.C. § 949a; and the Rules for Military Commissions**

71.     Petitioner incorporates paragraphs 1 – 70 *supra*.

72.     The Detainee Treatment Act ("DTA") provides that "[n]o individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment." 42 U.S.C. § 2000dd(a). In defining what those terms mean, the Executive Branch with the acquiescence of Congress has taken the formal position that this includes "the Sixth Amendment's guarantee of a speedy and public trial and the right to counsel." Initial Report of the United States of America to the Committee Against Torture, UN Doc. CAT/C/28/Add.5, at ¶ 137 (Feb. 9, 2000).

73.     Petitioner also has statutory rights to a fair trial under the MCA. The MCA guarantees, at a minimum, the right to "present evidence in the accused's defense, to cross-examine the witnesses who testify against the accused, and to examine and respond to all evidence admitted against the accused on the issue of guilt or innocence and for sentencing." 10 U.S.C. § 949a(b)(2)(A). The MCA further grants a military commission defendant the right "to obtain witnesses and evidence . . . comparable to the opportunity available to a criminal defendant in a court of the United States under article III of the Constitution." *Id*. at § 949j(a).

74.     The rules implementing the MCA, including the RMC and the Military Commission Rules of Evidence ("MCRE"), have the force of law under 10 U.S.C. § 949a(a). These rules establish many procedural and evidentiary rights in favor of the accused. Those procedural rights include, among others, the right to: receive exculpatory evidence as soon as practicable after referred charges at RMC 701(e), including evidence that reasonably tends to

impeach the credibility of a witness at 701(e)(2); to have a military judge specify the time, place, and manner of making discovery and prescribe such terms and conditions as are just at RMC 701(l)(1); and to have a reasonable opportunity to obtain witnesses and other evidence as provided in these rules at RMC 703(a). The RMC also affords Petitioner the right to protect his liberty interests through motions practice before a military judge who can rule on those issues and oversee proceedings to ensure that they are conducted in accordance with the law. *See, e.g.*, RMC 703(d), 906.

75.     Respondents' unreasonable and continuing delay in initiating criminal proceedings against Petitioner has irreparably impaired his ability to exercise these rights, including his rights to a speedy trial, to access witnesses and exculpatory evidence, to prepare a defense, and to consult with counsel.

## Ground IV

### Violation of Equal Justice Under Law

76.     Petitioner incorporates paragraphs 1 – 75 *supra*.

77.     The exercise of personal jurisdiction in a criminal case violates the Constitution when the application of the statute to the defendant is arbitrary or fundamentally unfair. That can result from the arbitrary application of a facially neutral statute or where a law's narrow statutory coverage targets a suspect class.

78.     Under § 948c of the MCA, military commission charges may only be levied against "*alien* unlawful enemy belligerents." 10 U.S.C. § 948c (emphasis added). Personal jurisdiction, therefore, invidiously and unconstitutionally targets the suspect class of which Petitioner is a member for prosecution in violation of equal justice under law.

26

**Ground V**

**Violation of 10 U.S.C. § 948c**

79. Petitioner incorporates paragraphs 1 – 78 *supra*.

80. Under § 948c of the MCA, military commission charges may only be levied against "alien unprivileged enemy belligerents." 10 U.S.C. § 948c. Section 948(7) defines "unprivileged enemy belligerent" not in terms of an immutable legal status, but in terms of a putative defendant's having participated in hostilities in one of three ways:

> [A]n individual (other than a privileged belligerent) who—
>
> > (A) has engaged in hostilities against the United States or its coalition partners;
> >
> > (B) has purposefully and materially supported hostilities against the United States or its coalition partners; or
> >
> > (C) was a part of al Qaeda at the time of the alleged offense under this chapter.

*Ibid.* "Hostilities," in turn, is defined as a "conflict subject to the laws of war." *Id.* at § 948a(9).

81. Petitioner is not an unprivileged enemy belligerent. None of the charges he ostensibly faces allege that he engaged in any hostilities against the United States or its coalition partners, that he supported such hostilities, or that he was part of al Qaeda at the time of any offense for which he may be charged. These charges, and Respondents use of the continued threat to convene a military commission to try them to deprive Petitioner of his liberty, is arbitrary and unlawful.

**Ground VI**

**Violation of 10 U.S.C. § 950p(c)**

82. Petitioner incorporates paragraphs 1 – 81 *supra*.

27

83.     Under § 950p(c) of the MCA, "[a]n offense specified in this subchapter is triable by military commission under this chapter only if the offense is committed in the context of and associated with hostilities." 10 U.S.C. § 950p(c). "Hostilities" is defined as a "conflict subject to the laws of war." *Id*. at § 948a(9).

84.     Even taken in the light most favorable to Respondents, none of the charges Petitioner ostensibly faces allege that he engaged in any hostilities subject to the law of war. These charges, and Respondents use of the continued threat to convene a military commission to try them to deprive Petitioner of his liberty, is arbitrary and unlawful.

## Ground VII

### Violation of the Authorization for the Use of Military Force

85.     Petitioner incorporates paragraphs 1 – 84 *supra*.

86.     The AUMF only authorizes Respondents to detain Petitioner if he was a part of or substantially supported al Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces.

87.     Petitioner is not, nor has he ever been, a member of al Qaeda, the Taliban, or an Associated Force. He never engaged in hostilities against the United States, nor did he support such hostilities. Petitioner's continuing detention is therefore unlawful.

## Ground VIII

### Violation of Article III § 2, cl. 3 (Ex Post Facto)

88.     Petitioner incorporates paragraphs 1 – 87 *supra*.

89.     Article III § 2, cl. 3, of the U.S. Constitution forbids Congress from passing any *ex post facto* law. Ex post facto laws include the creation of novel crimes with retroactive effect.

28

Prior to the MCA of 2006, there was no federal law prohibiting a conspiracy to commit war crimes or making such a crime triable by military commission. The MCA first enacted three such conspiracy offenses. MCA §§ 3, 4(b), 6(b). Respondents charging Petitioner with the conspiracy offense now codified at 10 U.S.C. § 950t(29) violates the Ex Post Facto Clause and is therefore unlawful.

## Ground IX

### Violation of the Prohibition on Arbitrary Punishment

90.     Petitioner incorporates paragraphs 1 – 89 *supra*.

91.     The Fifth and Eighth Amendments forbid the arbitrary imposition of punishment not authorized by law. Pre-trial and non-incarceral detainees further enjoy a right against the arbitrary imposition of security measures without due process of law.

92.     The DTA provides that "[n]o individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment." 42 U.S.C. § 2000dd(a). In defining those terms, the Executive Branch with the acquiescence of Congress has taken the position that this includes the right to "be subjected to special security measures and segregation from the general prison population only in limited circumstances necessary to maintain the safety and security of the inmates or staff of an institution. Prisoners are entitled to due process protections in the application of these measures and to a federal remedy when the conditions violate the standards of the Eighth Amendment." Initial Report of the United States of America to the Committee Against Torture, UN Doc. CAT/C/28/Add.5, at ¶ 144 (February 9, 2000).

93.     Respondents' continuing designation of Petitioner as a HVD imposes direct, material, and significant burdens on his conditions of confinement and his access to counsel.

29

Respondents' imposition of this label on Petitioner based upon not anything he has done but on its decision to subject him to "enhanced interrogation techniques" is an arbitrary and capricious imposition upon his liberty interests.

**Ground X**

**Violation of the Requirement under AR 190-8 to Provide for a Mixed Medical Commission**

94. Petitioner incorporates paragraphs 1 – 93 *supra*.

95. U.S. Army Regulation 190-8 requires the repatriation of sick or wounded detainees such as Petitioner if deemed necessary by a mixed medical commission. Petitioner has suffered physical and mental harm while in the custody of Respondents, and should have access to a medical commission. However, Respondents have blocked any means by which Petitioner can properly begin to request one. Petitioner is unable to hire an expert to evaluate him, and his counsel are unable to obtain his medical records.

96. Because of the severe actions of the Respondents in torturing and abusing Petitioner, he is likely in need of long-term medical care, but no independent clinician has been able to evaluate him to determine his precise diagnoses. By denying a mixed medical commission, or even the ability for counsel to see their client's medical records, Respondents are abrogating the application of the ruling of this Court in *Al-Qahtani*.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner asks this honorable court to:

1. Issue a writ of habeas corpus enjoining Petitioner's unlawful trial before an *ad hoc* military commission;

2. Enter a judgment declaring that trying Petitioner before a military commission is unlawful due to the arbitrary, prejudicial, and unconstitutional delay by the Office of Military Commissions;

3. Enter a judgment declaring that trying Petitioner before a military commission is unlawful because the Military Commissions Act unconstitutionally segregates those subject to the military commissions' personal jurisdiction on the basis of alienage;

4. Enter a judgment declaring that trying Petitioner before a military commission is unlawful because Petitioner is not an alien unlawful enemy combatant;

5. Enter a judgment declaring that trying Petitioner before a military commission is unlawful because Petitioner is not accused of any acts which occurred in the context of or were associated with hostilities;

6. Enter a judgment declaring that trying Petitioner before a military commission is unlawful because the Military Commissions Act is an unconstitutional *ex post facto* law;

7. Enter a judgment declaring that Petitioner has been and continues to be held unlawfully because he is not an enemy combatant;

8. Enter a judgment declaring that Petitioner has been and continues to be held unlawfully because even if he was an enemy combatant, he is no longer detainable because the relevant hostilities have concluded;

9. Enter a judgment directing Respondents to release Petitioner;

31

10. Enter a judgment declaring Respondents' designation of Petitioner as a "High Value Detainee" to be unlawful;

11. Enter a judgment directing Respondents to provide Petitioner's counsel with Petitioner's medical records;

12. Enter a judgment directing Respondents to permit Petitioner to receive an independent medical evaluation;

13. Enter a judgment directing Respondents to conduct a Mixed Medical Commission to determine if Petitioner must be released; and

14. Enter such other remedies and relief as this Court deems proper.

Respectfully submitted,[2]

Michel Paradis [D.C. Bar No. 499690]
U.S. DEPARTMENT OF DEFENSE
MILITARY COMMISSION DEFENSE
ORGANIZATION
1620 Defense Pentagon
Washington, DC 20301

John D. Cella [D.C. Bar No. 1035356]
Emma K. Dinan [D.C. Bar No. 1015108]
Charles A. Blanchard [D.C. Bar No. 1022256]
Allison B. Rumsey [D.C. Bar No. 450475]
Drew A. Harker [D.C. Bar No. 412527]
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001

---

[2] LCDR Aaron J. Shepard, Judge Advocate General's Corps, U.S. Navy was integral in the decision-making, preparation, and drafting of this petition. However, he was denied the ability to represent Petitioner in this Court by the U.S. Navy. LCDR Shepard is Mr. Bin Lep's lead military defense counsel at the MCDO, and is the single attorney most familiar with the case and Mr. Bin Lep's circumstances. On August 14, 2020, LCDR Shepard requested permission from the Judge Advocate General of the Navy to make an appearance in this case. However, it was denied on October 1, 2020, based upon it not being in the best interest of the Navy or the Judge Advocate General's Corps.

32

Kenneth P. Troccoli [D.C. Bar No. 384897]
FEDERAL PUBLIC DEFENDER FOR THE EASTERN
DISTRICT OF VIRGINIA
1650 King Street, Suite 500
Alexandria, VA 22314

James A. Cohen [Pro hac vice]
FORDHAM UNIVERSITY SCHOOL OF LAW
150 West 62nd Street
New York, NY 10023

**CERTIFICATE OF SERVICE**

I certify that on October, 15, 2020, I caused the foregoing to be served on Respondent's counsel by delivering four copies to the Court Security Officer pursuant to the Amended Protective Order for Habeas Cases Involving Top Secret/Sensitive Compartmented Information and Procedures for Counsel Access to Detainees at the United States Naval Station in Guantanamo Bay, Cuba, in Habeas Cases Involving Top Secret/Sensitive Compartmented Information, Case Nos. 08-MC-442-TFH (Dkt. Nos. 1481 and 1496) & 08-cv-01207-RJR (Dkt. Nos. 79 & 80) (D.D.C. 9 January 2009).

Dated: October 15, 2020

_____
Michel Paradis [D.C. Bar No. 499690]
U.S. DEPARTMENT OF DEFENSE
MILITARY COMMISSION DEFENSE
ORGANIZATION
1620 Defense Pentagon
Washington, DC 20301