## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MOHAMMED NAZIR BIN LEP,**

      **Petitioner,**

        **v.**

**DONALD J. TRUMP et al.,**

      **Respondents.**

          **Civil Action No. 20-3344 (JDB)**

### MEMORANDUM OPINION

Petitioner Mohammed Nazir Bin Lep is a detainee at the Guantanamo Bay Naval Station in Guantanamo Bay, Cuba.  Bin Lep has been held in U.S. custody for seventeen years pursuant to the 2001 Authorization for Use of Military Force ("AUMF"), which permits the U.S. to detain persons who were part of or substantially supported al-Qaida, the Taliban, or associated forces. See Pub. L. No. 107-40, 115 Stat. 224 (2001).  The Guantanamo Review Task Force identified Bin Lep as a target for prosecution in January 2010.  Two sets of draft charges have since been sworn against him, but no formal charges have yet been brought.  Bin Lep now seeks a court order enjoining the government from "taking any further steps to unlawfully try him by military commission" because he contends that the delays in prosecuting his case and bringing him to trial, as well as the disparate treatment of non-citizens by the commission system, have rendered any future prosecution unlawful.  See Pet'r's Mot. for a Prelim. Inj. ("Pet'r's Mot.") [ECF No. 41] at 1.  At the same time, he has filed a habeas petition seeking his immediate release.  See Pet. for a Writ of Habeas Corpus ("Habeas Pet.") [ECF No. 40].  For the reasons explained below, the Court will deny Bin Lep's motion for a preliminary injunction at this time.

## Background

Bin Lep is a citizen of Malaysia who has been detained by the United States at Guantanamo as an "enemy combatant" pursuant to the AUMF for his alleged participation in various al-Qaida operations against the United States.  Habeas Pet. ¶¶ 1, 8.  Bin Lep was captured by local authorities in 2003 and placed in the custody of the Central Intelligence Agency ("CIA") shortly thereafter.  Redacted Decl. of Mark S. Martins ("Martins Decl.") [ECF No. 51-1] ¶ 4.  He has been held at Guantanamo since 2006.  Id.  In 2009, President Obama ordered an interagency task force to evaluate the status of each Guantanamo detainee to determine if transfer, prosecution, or continued detention was appropriate.  See Exec. Order No. 13,493, 74 Fed. Reg. 4901 (Jan. 27, 2009).  That task force recommended Bin Lep for prosecution in January 2010.  See Guantanamo Review Dispositions, Letter from U.S. Dep't of Justice (June 17, 2013) Enclosure at 4, https://perma.cc/23H5-5ZXP (referring to petitioner as Bashir bin Lap).

The Military Commissions Act of 2009 ("MCA") authorizes the President to establish military commissions to try alien unprivileged enemy combatants for war crimes or other offenses triable by military commissions.   10 U.S.C. § 948b(a)-(b).   Before a military commission proceeding begins, charges against the accused must be sworn by a member of the armed forces having knowledge or reason to believe the matters alleged are true.  Id. § 948q.  Then, the Secretary of Defense or his designee—here, the Convening Authority—considers the sworn charges and supporting evidence and decides whether to dismiss or modify the charges, forward them to another authority for disposition, or refer the charges to a military commission.  Rules for Military Commissions ("R.M.C.") 401, 406, 601.  Finally, a military commission must be convened.  Id. at 504, 601.  All of these elements are required for a "referral" of charges, which is "the order of a convening authority that charges against an accused will be tried by a specified military

commission." Id. at 601(a), 601(a) Discussion.

"Service of charges" on the accused and his counsel is required "as soon as practicable" after referral. See Regulation for Trial by Military Commission § 4-4(2011), https://www.mc.mil/Portals/0/2011%20Regulation.pdf. The service of charges also entitles the accused to specific disclosures and other discovery-related privileges. See R.M.C. 701. And once charges are served, the accused must be arraigned within thirty days, a military commission must be assembled within 120 days, and an appropriate schedule for discovery must be set "as soon as practicable." Id. at 707(a). However, neither the MCA nor the Rules for Military Commissions impose a specific deadline by which the Convening Authority must refer charges to a military commission and thus trigger these various procedural rights.

In 2011, President Obama also established a Periodic Review Board ("PRB") to consider on an intermittent basis whether continued detention of individuals held at Guantanamo remains "necessary to protect against a significant threat to the security of the United States." Exec. Order No. 13,567, 76 Fed. Reg. 13277 (Mar. 10 2011). If the PRB determines, in its discretion, that continued detention is unnecessary, then the Secretaries of State and Defense must take "vigorous efforts . . . to identify a suitable transfer location" for the detainee. Id. Congress has mandated that the PRB consider at least five factors in making its assessment, including "the likelihood the detainee may be subject to trial by military commission." Nat'l Def. Auth. Act for Fiscal Year 2012 ("NDAA 2012"), Pub. L. No 112-81, § 1023(b)(4), 125 Stat. 1298, 1564–65 (2011).

The crimes that Bin Lep allegedly committed transpired between 1996 and 2003. See Habeas Pet. ¶ 25. The Office of the Chief Prosecutor of the Department of Defense first swore draft charges against Bin Lep for that conduct on December 7, 2017. Martins Decl. ¶ 5. Those charges were returned by the Convening Authority at least twice because they did not attach the

requisite endorsement attesting whether a trial would be harmful to national security.  <u>Id.</u> ¶¶ 6–7.

On April 5, 2019, the Chief Prosecutor swore a second set of charges against Bin Lep—adding

"additional specifications to existing charges and alleg[ing] an additional charge of conspiracy."

<u>Id.</u> ¶ 14.  These charges were sent to the Convening Authority on October 8, 2019, <u>id.</u> ¶ 17, but no

charges have yet been referred.

On October 15, 2020, Bin Lep filed his petition for a writ of habeas corpus challenging,

<u>inter alia</u>, the legality of any future prosecution against him.[1]  Habeas Pet. at 1.  Bin Lep also

moved for a preliminary injunction precluding the government from "taking any further steps to

. . . try him by military commission" until his habeas petition has been resolved.  Pet'r's Mot. at 1.

As grounds for the injunction, he asserts that the government's continued threat to prosecute him

before a military commission is unlawful because (1) that threat arbitrarily impairs his right to seek

habeas relief; (2) any prosecution would necessarily violate his speedy trial rights; and (3) any

prosecution would violate principles of equal justice because only non-citizens can be tried by

military commission under the MCA.  Mem. of Law in Supp. of Pet'r's Mot. for a Prelim. Injunc.

("Pet'r's Br.") [ECF No. 41-1] at 11, 16, 24.  The government opposes Bin Lep's motion on all

three grounds.  <u>See</u> Resp'ts' Opp'n to Pet'r's Mot. for Prelim. Inj. ("Resp'ts' Opp'n") [ECF No.

38].  The motion has been fully briefed and is now ripe for the Court's consideration.

## <u>Threshold Issues</u>

Before reaching the merits of Bin Lep's request for preliminary relief, the Court must

---

[1] Bin Lep has filed two prior habeas petitions in this Court.  He filed his first petition in 2009 challenging, <u>inter alia</u>, the legality of his detention under the AUMF, Pet. for Writ of Habeas Corpus, No. 09-cv-0031 (JDB) [ECF No. 1], but he voluntarily dismissed that petition without prejudice in 2013, Stipulation, No. 09-cv-0031 (JDB) [ECF No. 91].  His second habeas petition in 2019 challenged certain pre-referral actions by the government that would limit his ability to access and use evidence in a future commission trial.  Those proceedings resulted in a preliminary injunction, <u>see</u> Mem. Op. & Order, No. 19-cv-2799 (JDB) [ECF No. 25] (public version) ("Mem. Op. & Order (Sept. 23, 2019)"); thereafter, based on subsequent developments, the petition was dismissed with prejudice as moot, Order, No. 19-cv-2799 (JDB) [ECF No. 32].

examine the threshold issues of jurisdiction and abstention.  For the reasons summarized below, the Court is confident that it has jurisdiction to review Bin Lep's claims and that abstention, at this time, is unwarranted.

A.    **Jurisdiction**

28 U.S.C. § 2241(e)(2) strips this Court of jurisdiction to review a detainee's non-habeas claims, and therefore the controlling jurisdictional question is whether Bin Lep's claims sound in habeas.  Aamer v. Obama, 742 F.3d 1023, 1030 (D.C. Cir. 2014).  "[A] person is entitled to the writ of habeas corpus when, though lawfully in custody, he is deprived of some right to which he is lawfully entitled even in his confinement, the deprivation of which serves to make his imprisonment more burdensome than the law allows or curtails his liberty to a greater extent than the law permits."  Id. at 1036 (quoting Miller v. Overholser, 206 F.2d 415, 420 (D.C. Cir. 1953)).  Challenges to the place, fact, or duration of confinement, as well as to the conditions of confinement, are all proper habeas claims.  Id.

The government argues that Bin Lep's claims do not sound in habeas because they "do[] not go to any aspect of his confinement or its lawfulness," but instead "concern only an 'aspect' of his possible 'trial.'"  Resp'ts' Opp'n at 8.  According to the government, Aamer requires that a conditions-of-confinement claim render the claimant's detention "illegal," and "where a detainee is, like Petitioner, an alien unprivileged enemy combatant legitimately detained under the AUMF," no such argument can be made.  See id. at 9.  This assertion, however, does not square with the plain language of Aamer analyzing whether the alleged deprivation "serves to make [petitioner's] imprisonment more burdensome than the law allows or curtails his liberty to a greater extent than the law permits."  742 F.3d at 1036 (quoting Miller, 206 F.2d at 420) (emphases added).  Rather,

the Court finds that Bin Lep's claims are cognizable in habeas whether viewed as challenges to the place, fact, or duration of his confinement, or as conditions-of-confinement claims.

Bin Lep seeks to prohibit an allegedly unlawful threat of prosecution by a military commission on the theory that this threat deprives him of his right to seek meaningful habeas review of his detention status and otherwise violates his rights to a speedy trial and equal protection. Although the government rightly states that jurisdiction should not hinge on an "overly speculative" prediction about a series of events, see Turlock Irrigation Dist. v. FERC, 786 F.3d 18, 24 (D.C. Cir. 2015), it seems straightforward that the status of Bin Lep's prosecution—whether it were to proceed or be prohibited altogether—could affect the fact, duration, or place of his confinement. See Mem. Op. & Order (Sept 23, 2019) at 6 (explaining that a challenged government action that "could have an immediate effect on whether the charges against Bin Lep are dismissed . . . obviously could affect the fact, duration, or place of [his] confinement").

Bin Lep's claims also concern his ability to "exercise" various "procedural rights while in confinement." See id. at 5; see also Pet'r's Br. at 3. Bin Lep alleges that due to the pendency of draft charges, the government has unduly restricted his access to discovery and denied him the ability to obtain exculpatory evidence; and these deprivations, Bin Lep says, have infringed on his rights to seek habeas relief and to participate in the PRB process to secure his release. See Pet'r's Br. at 4. As this Court has previously recognized, interference with a procedural right can amount to an unlawful "condition of confinement." See Mem. Op. & Order (Sept 23, 2019) at 5 (finding jurisdiction where challenges concerned "allegedly unlawful restrictions on [Bin Lep's] ability to access and use exculpatory evidence"); see also Hatim v. Obama, 760 F.3d 54, 57 (D.C. Cir. 2014) (explaining that a claim alleging interference with a detainee's access to counsel "falls squarely

within" <u>Aamer</u>'s framework because the procedures challenged are "conditions of confinement").[2]
Bin Lep's allegations thus address conditions of confinement because he claims that the threat of
unlawful prosecution "curtails [his] liberty to a greater extent than the law permits."  See <u>Aamer</u>,
742 F.3d at 1036.

### B.    Abstention

The government argues that the Court should abstain from deciding Bin Lep's motion
under <u>In re al-Nashiri</u> ("<u>al-Nashiri II</u>"), 835 F.3d 110 (D.C. Cir. 2016), or general equitable
principles in order to "allow the military commission system to work free from premature
interference by federal courts."  Resp'ts' Opp'n at 10.  The D.C. Circuit held in <u>al-Nashiri II</u> that
a federal court should abstain from resolving a petitioner's claim that a military commission lacks
subject matter jurisdiction to try his offense while pretrial commission proceedings are ongoing.
835 F.3d at 125.  But, as this Court has already explained, abstention under <u>al-Nashiri II</u> is not
warranted where "there is no pending matter in any other judicial system, including any military
commission."  See Mem. Op. & Order (Sept. 23, 2019) at 9.

The D.C. Circuit directly addressed the issue in <u>Obaydullah v. Obama</u>, concluding that—
even though draft charges had been sworn against petitioner—"abstention is surely not appropriate
where, as here, there is no military commission, let alone an ongoing proceeding."  609 F.3d 444,
445, 448 (D.C. Cir. 2010).  Here, as in <u>Obaydullah</u>, the "charges against [Bin Lep] have not been
referred and the Government has provided [the Court] with no reason to believe such a referral is
imminent."  See <u>id.</u> at 448.

---

[2] The government seeks to distinguish <u>Hatim</u> on the ground that the jurisdictional decision there was based
on the government's "concession" that the "alleged restrictions on access to counsel for the purpose of habeas
proceedings did not constitute a condition of confinement."  Resp'ts' Opp'n at 9.  This distinction has no force.  A
court has an "independent obligation to determine whether subject-matter jurisdiction exists," <u>Arbaugh v. Y&H Corp.</u>,
546 U.S. 500, 501 (2006), and therefore the D.C. Circuit could not have found jurisdiction proper in <u>Hatim</u> unless it
agreed that petitioner had indeed challenged a condition of his confinement.

The government nonetheless seeks to distinguish <u>Obaydullah</u> on the grounds that the habeas petition at issue there had nothing to do with the military commission process and only asserted a detention-related claim that petitioner was "entitled to bring under the Suspension Clause." <u>See</u> Resp'ts' Opp'n at 14–15.  But the reasoning in <u>Obaydullah</u> hinged on the existence of other ongoing proceedings, not the type of habeas claim brought.  And the government's attempt to characterize the claim at issue in <u>Obaydullah</u> as somehow more legitimate than Bin Lep's allegations here simply conflates the abstention analysis with the jurisdictional and merits questions whether Bin Lep's claims are cognizable in habeas or likely to succeed.

The government also asserts that the comity interests recognized in <u>al-Nashiri II</u> are nonetheless implicated because Bin Lep's motion asks "this Court to decide issues a military commission should decide." <u>See</u> Resp'ts' Opp'n at 14.  The Court acknowledges that Bin Lep's claims—particularly concerning pre-trial delays and speedy trial violations—might be better addressed by a military commission in the first instance.  But the main thrust of Bin Lep's motion is that seventeen years have passed since he was detained and still no military commission has been convened in which he could raise such arguments.

The D.C. Circuit stated in <u>al-Nashiri II</u> that a court should not "halt the workings of a military commission by challenging in federal court an issue that could just as easily be considered by the commission and reviewed by a federal appellate court." 835 F.3d at 125.  The court's justification for abstention relied heavily on the existence of a military commission that could adequately protect the petitioner's rights.  <u>See id.</u> at 122–23.  But here, no commission has been convened, and there is no other forum for Bin Lep to turn to for relief.[3]  The government cites no

---

[3] The <u>al-Nashiri II</u> court also recognized that "an unreasonable delay in military-commission proceedings [may] come within an exception to abstention." 835 F.3d at 135.  Although the court did not definitively recognize such an exception, let alone define its contours, this statement lends credence to this Court's view that where a petitioner lacks any other forum in which to assert his claims, abstention is not warranted.

instances where a district court has abstained from resolving a Guantanamo detainee's habeas petition on the grounds that a military commission <u>might</u> be convened to someday address the issues raised.  Abstention, therefore, is not appropriate.

### **Merits Issues**

The Court now turns to the merits of Bin Lep's request for a preliminary injunction barring the government from taking any further steps to try him by military commission.  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the [moving party] is entitled to such relief."  <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008).  The party seeking a preliminary injunction must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." <u>Id.</u> at 24.  A preliminary injunction is ordinarily granted "to preserve the status quo pending the resolution of the underlying litigation."  <u>Abdullah v. Bush</u>, 945 F. Supp. 2d 64, 67 (D.D.C. 2013). The first factor in the preliminary injunction standard is the "most important," <u>Aamer</u>, 742 F.3d at 1038, and "[w]hen a plaintiff has not shown a likelihood of success on the merits," the court "need not consider the other factors," <u>Greater New Orleans Fair Hous. Action Ctr. v. HUD</u>, 639 F.3d 1078, 1088 (D.C. Cir. 2011).  The "failure to show <u>any</u> irreparable harm is [also] grounds for refusing to issue a preliminary injunction."  <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006) (emphasis added); <u>see also</u> <u>Mylan Laboratories Ltd. v. FDA</u>, 910 F. Supp. 2d 299 (D.D.C. 2012) ("[A] showing of some irreparable harm is . . . an independent prerequisite for a preliminary injunction.").

### A.    **Likelihood of Success on the Merits**

Bin Lep offers three grounds for the requested injunction: (1) the continued threat of an

unreasonably delayed prosecution arbitrarily impairs his right to seek meaningful habeas review; (2) any prosecution would necessarily violate his speedy trial rights; and (3) any prosecution would violate principles of equal justice because the MCA authorizes military commission trials for non-citizens only.  Pet'r's Br. at 11, 16, 24.  The Court will address each argument in turn.

### i.      Unreasonable Delay Claim

Bin Lep asserts that the government's "unreasonable" and "inexplicable" delay in referring charges to a military commission has rendered any future prosecution an oppressive, ultra vires exercise and arbitrarily impaired his right to challenge his detention through habeas corpus.  Pet'r's Br. at 13, 14.  In his opening brief, Bin Lep contends that a "timely brought military commission prosecution" would have granted him an opportunity to "obtain witnesses and other evidence, including exculpatory or mitigating evidence in the government's possession," but that "those rights are now permanently lost" because many "potential exculpatory and mitigation witnesses . . . have been executed by foreign governments, have died of other causes, or are otherwise now unavailable."  Id. at 14–15.  In his reply, Bin Lep backs away from this broader claim, focusing only on his "primary" allegation that the government's "undue delay" in prosecuting his case has obstructed his right to habeas corpus.  See Reply Mem. of Law in Supp. of Pet'r's Mot. for a Prelim. Injunc. ("Pet'r's Reply") [ECF No. 45] at 8.

A court typically considers an "oppressive" pre-indictment delay under the due process rubric, examining whether the prosecutor's delay was "an intentional device to gain tactical advantage over the accused" that "caused substantial prejudice to [the accused's] rights to a fair trial."  See, e.g., United States v. McCormick, Crim. No. 18-0359 (JDB), 2019 WL 6311898, at *2 (D.D.C. Nov. 25, 2019) (citing United States v. Marion, 404 U.S. 307, 324 (1971)).  But this type of claim is not currently available to Bin Lep, given the D.C. Circuit's recent pronouncement

in <u>Al-Hela v. Trump</u> that Guantanamo detainees lack any due process rights.[4]  <u>See</u> 972 F.3d 120,

150 (D.C. Cir. 2020) ("[T]he Due Process Clause cannot be invoked by Guantanamo detainees,

whether those due process rights are labeled 'substantive' or 'procedural.'").  Bin Lep instead

argues that the government's unreasonable pre-referral delay has obstructed his habeas rights

under the Suspension Clause because "the looming threat of potential prosecution prevents him

from developing the record he needs" to challenge the legality of his detention under the AUMF.

<u>See</u> Pet'r's Br. at 15.

Bin Lep asserts that his "claim is substantively identical" to the one sustained by the

Supreme Court in <u>Boumediene v. Bush</u>, 553 U.S. 723 (2008).  Pet'r's Reply at 8.  The Court in

<u>Boumediene</u> established that every Guantanamo detainee is "entitled to a prompt habeas corpus

hearing" that provides a "meaningful opportunity to demonstrate" the illegality of his detention

under the AUMF.  553 U.S. at 779, 795.  And although the Court left to the federal district courts,

in the first instance, to determine what procedural protections must be afforded to fulfill this right,

<u>see</u> <u>id.</u> at 796, it recognized that such a right could be impermissibly infringed if a detainee had to

wait for a tribunal to adjudicate his enemy combatant status before he could challenge that status

through a habeas petition in federal court, <u>id.</u> at 794.

The critical difference here is that, even as Bin Lep has awaited his prosecution, he has

been—and continues to be—free to contest his enemy combatant status through habeas.  Bin Lep,

in fact, originally filed such a habeas petition in 2009, but chose voluntarily to dismiss that petition

without prejudice in 2013.  <u>See</u> Pet. for Writ of Habeas Corpus, No. 09-cv-0031 [ECF No. 1],

Stipulation and Order, 09-cv-0031 [ECF No. 90].  Bin Lep has now brought another habeas petition

---

[4] Bin Lep contends that <u>Al-Hela</u> was wrongly decided.  Pet'r's Br. at 26.  The Court notes that a petition for rehearing <u>en banc</u> in <u>Al-Hela</u> is pending, but this Court is bound by that decision unless and until it is further acted upon by the D.C. Circuit.  <u>See</u> <u>LaShawn A. v. Barry</u>, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (explaining that a panel decision is by statute "the decision of the court" unless otherwise acted upon by the full <u>en banc</u> court).

challenging his detention under the AUMF, see Pet. for Writ of Habeas Corpus [ECF No. 40], and following the resolution of this motion, may proceed with that petition in this Court.  Hence, Bin Lep has not—as he says—been "require[d] . . . to complete a military commission trial before proceeding with his habeas corpus action."  See Pet'r's Reply at 11.

Boumediene was "explicit" that a detainee seeking habeas relief "must be afforded those 'procedural protections' necessary (i) to 'rebut the factual basis for the Government's assertion that he is an enemy combatant,' (ii) to give the prisoner 'a meaningful opportunity to demonstrate [his detention is unlawful],' and (iii) to create a record that will support 'meaningful review' by the district court."  Qassim v. Trump, 927 F.3d 522, 528–29 (D.C. Cir. 2019) (quoting Boumediene, 553 U.S. at 779, 783).  The D.C. Circuit has explained that "[m]eaningful review in this context requires that a court have 'some authority to assess the sufficiency of the Government's evidence against the detainee' and to 'admit and consider relevant exculpatory evidence' that may be added to the record by [the] petitioner."  Al-Bihani v. Obama, 590 F.3d 866, 875 (D.C. Cir. 2010) (quoting Boumediene, 553 U.S. at 786).  At this stage of the proceedings, this Court cannot say that these standards will not be met.

The Court does not doubt Bin Lep's assertions that he would be better positioned to develop a factual record in his habeas case if he did not have to worry about the ramifications for his criminal prosecution.  But those concerns do not amount to an unlawful infringement of his habeas rights under Boumediene.  Defense counsel are often encumbered by similar types of tactical decisions whenever the threat of additional criminal charges looms.  For instance, counsel may need to evaluate whether a strategy to defend a federal prosecution might open a client up to liability at the state level, or vice-versa.  And counsel often must weigh the risks of seeking out particular witnesses who could both exculpate and inculpate a client.  That does not mean that

those clients have been denied a meaningful opportunity to make their case.  Moreover, given that, under binding D.C. Circuit case law, Guantanamo detainees receive fewer procedural protections in litigating their habeas petitions than are afforded in criminal trials, see Al-Bihani, 590 F.3d at 878, the Court finds it difficult to see how the burdens associated with strategic decisions of this nature are likely to constitute an infringement of a detainee's habeas rights.

Bin Lep also argues that the threat of prosecution has hindered his ability to show the PRB that his continued detention is unnecessary, which has prejudiced his habeas rights because his "ability to seek release . . . in the PRB process . . . directly informs his entitlement to relief under habeas." Pet'r's Br. at 15.  For starters, Bin Lep's suggestion that his ability to obtain habeas relief is contingent on the PRB process is misleading.  In Ali v. Trump, 959 F.3d 364 (D.C. Cir. 2020), the D.C. Circuit considered a habeas claim alleging that a seventeen-year detention period under the AUMF violated substantive due process.  Although the court considered the PRB's findings that petitioner's continued detention was necessary for reasons of national security, that decision did not imply that a detainee's access to the PRB process could negate his ability to challenge his enemy combatant status in federal habeas court.  See id. at 371.

Furthermore, even if Bin Lep's access to the PRB process does bear upon his habeas case, his argument fails for the same reason as above: Bin Lep has been and remains free to argue for his release before the PRB.  Notwithstanding Bin Lep's concerns that his statements to the PRB could be used against him in a future prosecution, his participation has not been "preclude[d]" as he alleges.  See Pet'r's Br. at 34.  His lawyers have continued to advocate for his release to the PRB since the swearing of draft charges, see Habeas Pet. ¶ 48, and should Bin Lep determine that the risks of speaking to the PRB are presently too great, he may have other witnesses testify on his behalf, see Sec. of Defense, Policy Mem., "Implementing Guidelines for Periodic Rev. of

Detainees Held at Guantanamo Bay per Exec. Order 13567" at 15 (Feb. 15, 2019), https://perma.cc/FDJ4-Z2HT.  It is true that the pendency of draft charges against Bin Lep may influence the PRB's decision in his case.  See NDAA 2012, 125 Stat. at 1565 (requiring the PRB to consider "the likelihood the detainee may be subject to trial by military commission"); see also Pet'r's Br. at 34.  But that factor is not dispositive, see NDAA 2012, 125 Stat. at 1564–65, and Bin Lep and his counsel are free to counter that impression by presenting evidence to the PRB—as they have to this Court—about "how weak [the government's] prosecutorial interest in [his] case really is."  See Pet'r's Reply at 20–21.

Finally, Bin Lep contends that he has been deprived of the ability to develop the factual record in his habeas case because, had the government prosecuted him sooner, the procedural protections afforded by the military commission process would have enabled him to obtain additional evidence, required the government to grant access to foreign witnesses, and authorized him to obtain funding to investigate his defense.  Pet'r's Br. at 14–15; see also Pet'r's Reply at 13–14.  The Court does not deny the logic of these assertions either.  But the fact that the Rules on Military Commissions entitle a detainee to certain protections to enable him to defend himself at trial does not mean that Bin Lep has a right to such resources to build his habeas case when no charges have been referred and a commission has not been convened.  And Boumediene does not suggest otherwise.  Federal courts have adjudicated habeas petitions of numerous Guantanamo detainees who were not yet referred for prosecution and likewise not entitled to the military commission system's resources to litigate their habeas cases.  See, e.g., Obaydullah v. Obama, 774 F. Supp. 2d 34, 39 (D.D.C. 2011).  Moreover, the federal habeas forum may offer Bin Lep many of the same resources that he asserts have been withheld, including funding for his legal team, see Criminal Justice Act, 18 U.S.C. § 3006A, discovery of exculpatory evidence, see Lnu v. Obama,

14

656 F. Supp. 2d 187, 191 (D.D.C. 2009), and the ability to challenge the government's alleged efforts to block access to foreign witnesses, see Rabbani v. Obama, 656 F. Supp. 2d 45, 55 (D.D.C. 2009).

In short, the Court does not discount that the government's considerable delay in prosecuting Bin Lep—and continuing uncertainty as to when any prosecution might begin—have saddled his counsel with difficult strategic decisions about how best to pursue Bin Lep's release. But Bin Lep has not made a clear showing that those burdens have infringed his habeas rights under Boumediene. The Court thus does not find that Bin Lep is likely to prevail on his claim of unreasonable delay.

### ii.     Speedy Trial Claim

Bin Lep next asserts that the government cannot lawfully threaten him with a criminal prosecution that would necessarily violate his speedy trial rights under the Sixth Amendment and the Detainee Treatment Act of 2005 ("DTA"). Pet'r's Br. at 16–24. The government responds that Bin Lep's "exclusive speedy trial rights are defined" by the Rules for Military Commissions, and denies that either the Sixth Amendment or the DTA affords Bin Lep additional protection. See Resp'ts' Opp'n at 22.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy a right to a speedy and public trial." U.S. Const. amend. VI. But "the Constitution does not require that every protection available in criminal trials must apply in military commission proceedings for Guantánamo detainees." Khadr v. Obama, 724 F. Supp. 2d 61, 67 (D.D.C. 2010); see also Hamdan v. Rumsfeld, 548 U.S. 557, 623 (2006) ("The President here has determined . . . that it is impracticable to apply the rules and principles of law that govern the trial of criminal

cases in the United States district courts . . . to [petitioner's military] commission.  We assume that complete deference is owed that determination." (internal quotation marks and citation omitted)).

No court has extended the Sixth Amendment speedy trial right to a Guantanamo detainee tried before a military commission, and in fact, the Supreme Court long ago determined that another Sixth Amendment right—to a trial by jury—could not be invoked in military commission proceedings.[5]  See Ex Parte Quirin, 317 U.S. 1, 39–41 (1942).  Bin Lep emphasizes that the Sixth Amendment speedy trial right is deeply-rooted in our constitutional history.  See Pet'r's Br. at 16.  But he does not offer any specific historical evidence that differentiates that right from other long-standing constitutional guarantees, like rights to a trial by jury or due process, that decidedly do not apply in military trials at Guantanamo.  See Al-Hela, 972 F.3d at 150; Quirin, 317 U.S. at 41.  Bin Lep also tries to distinguish Quirin by arguing that the "jury trial right . . . turns on the nature of the offense charged, not on the character of the proceeding."  See Pet'r's Reply at 12.  But this distinction is unpersuasive given that Quirin specifically analyzed the propriety of the defendants' trial for "offenses against the law of war by military commission," and never implied that the same defendants could lawfully be tried without a jury in federal court.  See 317 U.S. at 45 (emphasis added).

Bin Lep's argument that the DTA affords him a parallel speedy trial right fares no better.  The DTA states that no detainee "shall be subject to cruel, inhuman, or degrading treatment or punishment," 42 U.S.C. § 2000dd(a), meaning such treatment or punishment "prohibited by the

---

[5] One district court has considered the speedy trial rights of a former Guantanamo detainee, concluding that speedy trial rights "appl[y] to all, regardless of their citizenship or the crimes of which they are accused."  United States v. Ghaliani, 751 F. Supp. 2d 515, 520 (S.D.N.Y. 2010).  The circumstances in Ghaliani, however, were markedly different: there, the defendant had been indicted by a federal prosecutor in 1998 before he was captured and detained at Guantanamo; in 2009, he was transferred to the Southern District of New York to be tried on the 1998 indictment.  See id. at 521, 526.  Thus, Ghaliani does not inform this Court's analysis of whether a current Guantanamo detainee, like Bin Lep, who has never been indicted in a federal court, possesses Sixth Amendment speedy trial rights in a military commission where no charges have yet been referred.

Fifth, Eighth, and Fourteenth Amendments . . . , as defined in the United States Reservations, Declarations and Understandings to the United Nations Convention Against Torture," id. § 2000dd(d).  Notably absent from the text of these two DTA provisions is any reference to the Sixth Amendment.  Bin Lep turns to a 1990 Senate Report and a 2000 Executive Branch Report interpreting the United States' Convention Against Torture obligations to substantiate his claim. See Pet'r's Br. at 17–18.  However, although both documents reference the Sixth Amendment and the latter identifies the speedy trial guarantee, these reports also describe dozens of other constitutional rights, including specifically rights to a trial by jury and due process, which do not extend to Guantanamo detainees tried by military commission.  See Convention on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Rep. No. 101-30, at 19 (1990); Initial Report of the United States of America to the Committee Against Torture, UN Doc. CAT/C/28/Add.5, ¶ 1 (Feb. 9, 2000).  Hence, the Court does not find that these legislative and executive materials—developed well before the creation of the MCA—likely suffice to ground a parallel speedy trial right for Guantanamo detainees in the DTA.

The facts of Bin Lep's case also counsel against extending such a right to him for the first time.  The Sixth Amendment right to a speedy trial is triggered only by "a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge."  United States v. Lovasco, 431 U.S. 783, 788 (1977) (quoting United States v. Marion, 404 U.S. 307, 320 (1971)).  This standard does not apply naturally to Bin Lep's situation.  Here, there is no formal indictment or information, and even though Bin Lep is subject to "actual restraints," he is detained as an enemy combatant under the AUMF, not necessarily "to answer a criminal charge."  See id.  While Bin Lep suggests that his speedy trial rights were triggered by the Guantanamo Review Task Force's acknowledgement that his prosecution was feasible or by

the swearing of draft charges against him, Pet'r's Br. at 18–19, these circumstances do not clearly fall within the <u>Lovasco</u> standard.  Without further evidence to support Bin Lep's entitlement to a speedy trial under the Sixth Amendment or the DTA, then, the Court cannot conclude that he has made a clear showing that he is likely to succeed on this claim.

### iii.    Equal Protection Claim

Bin Lep's final argument is that the government cannot lawfully threaten him with a prosecution that necessarily violates equal protection principles.  Pet'r's Br. at 24.  According to Bin Lep, § 948c of the MCA impermissibly discriminates based on alienage because although "[c]itizens who commit terrorism offenses must face a regular judicial trial," non-citizens may be "segregated into a non-judicial military trial process, whose irregularity is demonstrated by the facts of this very case."  <u>See</u> <u>id.</u>

At the outset, the government denies that Bin Lep has a right to equal protection.  Resp'ts' Opp'n at 26.  The guarantee of equal protection resides in the Fourteenth Amendment and applies to the federal government through the Fifth Amendment's due process clause, <u>see</u> <u>Bolling v. Sharpe</u>, 347 U.S. 497, 500 (1954), which Bin Lep cannot presently invoke under <u>Al-Hela</u>, <u>see</u> 972 F.3d at 129.  Bin Lep flags this potential hurdle, but contends that he needs no specific "right" to challenge "something as fundamental as equal justice under the law" because "the denial of equal justice is an injury shared by all."  <u>See</u> Pet'r's Br. at 26–27.  As support for this contention, he relies heavily on <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 369 (1886), which pronounced that equal protection principles "are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences . . . of nationality."

The Supreme Court's broad statements in <u>Yick Wo</u> appear in a discussion about states' obligations under the equal protection clause.  <u>See</u> <u>id.</u>  And Bin Lep's ability to mount an equal

protection challenge against the federal government in this context appears sufficiently unsettled to give this Court pause about his likelihood of success on this claim.  See Bahlul v. United States, 840 F.3d 757, 797 (D.C. Cir. 2016) (Millet, J., concurring) ("[N]o relevant precedent plainly or clearly supports the application of equal protection principles in this law-of-war context to foreign enemy combatants."); see also United States v. Hamdan, 801 F. Supp. 2d 1247, 1318 (USCMCR 2011) (finding "no precedent comprehensively extending equal protection . . . rights to noncitizens tried by military commissions, either inside or outside the United States"), rev'd on other grounds, 696 F.3d 1238 (D.C. Cir. 2012).  But even if equal protection principles do apply here, the Court nonetheless concludes that Bin Lep has not shown that § 948c is likely unconstitutional.  See Al-Bahlul v. United States, 767 F.3d 1, 75 (D.C. Cir. 2014) (Kavanaugh, J., concurring) (rejecting the same claim as "meritless"); Hamdan, 801 F. Supp. 2d at 1318 (same).

Bin Lep's argument falters on its premise that § 948c must survive strict scrutiny.  See Pet'r's Br. at 27–28.  Although strict scrutiny typically applies to state classifications based on alienage, see In re Griffiths, 413 U.S. 717, 721 (1973), federal classifications based on alienage— at least where strong foreign policy concerns are implicated—receive only rational basis review, see Narenji v. Civiletti, 617 F.2d 745, 747 (D.C. Cir. 1979); see also, e.g., United States v. Ferreira, 275 F.3d 1020, 1025 (11th Cir. 2001); United States v. Santos-Rivera, 183 F.3d 367, 373 (5th Cir. 1999); United States v. Lopez-Flores, 63 F.3d 1468, 1473 (9th Cir. 1995).  This is because "there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual state."  Lopez-Flores, 63 F.3d at 1473 (citing Hampton v. Mow Sun Wong, 426 U.S. 88, 101 (1976)); see also Matthews v. Diaz, 426 U.S. 67, 84–85 (1976) ("[E]qual protection analysis . . . involves significantly different considerations [when] it concerns the relationship between aliens and the States rather than between aliens and the Federal

Government.").  Particularly in the context of national security, congressional policies regarding the treatment of non-citizens are entitled to considerable deference.  See Matthews, 426 U.S. at 81 n.17 ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power," and "[s]uch matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." (quotation omitted)).  Thus, to comply with the dictates of equal protection, § 948c need only be "rationally related to a legitimate government interest."  Al-Bahlul, 767 F.3d at 75 (Kavanaugh, J., concurring); see also Hamdan, 801 F. Supp. 2d at 1318.

The Court agrees with the government that Congress has a legitimate interest in establishing a system to try non-citizen enemy combatants suspected of committing war crimes against the United States.  See Al-Bahlul, 767 F.3d at 75 (Kavanaugh, J., concurring) (agreeing with the government that "Congress had a vital national security interest in establishing a military forum in which to bring to justice foreign unlawful belligerents whose purpose it is to terrorize innocent U.S. citizens and to murder U.S. military personnel"); Hamdan, 801 F. Supp. 2d at 1322 ("[A] legitimate government interest exists" because "Congress enacted the M.C.A. to create a forum and a process by which to bring to justice foreign unlawful combatants whose purpose is to terrorize American citizens.").

The military commission system that Congress created appears rationally related to this interest.  Cf. Hamdan, 548 U.S. at 645 (plurality opinion) ("Congress has the power and responsibility to determine the necessity for military courts, and to provide the jurisdiction and procedures applicable to them."); Quirin, 317 U.S. at 29–30 (recognizing the use of military commissions "to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war.").  Bin Lep nonetheless insists

that the MCA is "unprecedented in its underinclusiveness," because "a citizen can never be tried before [an MCA] military commission[]," even if he is "more culpable than an equally situated non-citizen."  Pet'r's Br. at 28–29.  But there is no evidence that Congress designed the MCA to apply to non-citizens because it viewed them as more culpable than citizens who had committed analogous crimes.

Rather, the military commission system serves national security interests because it "allow[s] for the protection of sensitive sources and methods of intelligence-gathering; allow[s] for the safety and security of participants; and take[s] into account the realities of the battlefield and the particular challenges of gathering evidence during military operations overseas."  Brad Wiegmann & Col. Mark Martins, Detention Policy Task Force Preliminary Report at 3 (July 20, 2009),  https://www.justice.gov/archive/opa/documents/preliminary-rpt-dptf-072009.pdf.   Given the practical difficulties associated with investigating and prosecuting war crimes, it is not irrational for Congress to devise a special system to try non-citizen enemy combatants, whom courts have historically recognized, particularly in war time, are not necessarily entitled to full constitutional protection.  Compare Reid v. Covert, 354 U.S. 1, 7–8 (1957) (holding that American citizens tried abroad in military tribunals could not be denied Fifth and Sixth Amendment rights), with Johnson v. Eisentrager, 339 U.S. 763, 785 (1950) (concluding the Fifth Amendment does not apply to non-citizen enemy combatants located outside the United States); see also Harisiades v. Shaughnessy, 342 U.S. 580, 587 (1952) ("War, of course, is the most usual occasion for extensive resort to the power" to treat non-citizens differently.); Al-Bihani, 590 F.3d at 877 n.3 ("[T]he procedures to which Americans are entitled are likely greater than the procedures to which non-citizens seized abroad during the war on terror are entitled.").

Bin Lep characterizes the MCA as a historical anomaly, asserting that "every military

commission system employed throughout U.S. history has tried suspected citizen war criminals alongside non-citizens."  Pet'r's Br. at 29.  But even assuming this is true, the government has also often, in practice, elected to try non-citizen and citizen war criminals in different fora, even for the same crimes.  See Hamdi v. Rumsfeld, 542 U.S. 507, 560 (2004) (Scalia, J., dissenting) (recounting historical instances where "citizens have been charged and tried in Article III courts for acts of war against the United States, even when their noncitizen co-conspirators were not").  Furthermore, even if the government has previously prosecuted some citizen war criminals in military tribunals, that does not prove that Congress's current preference to try citizens at home in traditional American courts is irrational.

Bin Lep nonetheless argues that § 948c "fails even rational basis scrutiny" because Congress's "disparate treatment [of non-citizens] is motivated by nothing more than animus." Pet'r's Br. at 32 (quoting Romer v. Evans, 517 U.S. 620, 632 (1996)).  Although it is well-established that "the Constitution's guarantee of equality must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot justify disparate treatment of that group," United States v. Windsor, 570 U.S. 744, 770 (2013) (internal quotation marks and citation omitted), Bin Lep has not shown that differential treatment of non-citizens under the MCA is likely predicated on such a desire.

Bin Lep cites various statements in the legislative record that express an intention to afford non-citizen enemy combatants fewer rights than American citizens.  See Pet'r's Br. at 30–32. Putting aside the fact that these statements predate the version of the MCA at issue here, the Court finds it difficult to conclude that they evince an invidious "desire to harm" when Bin Lep has not shown that non-citizens captured abroad during wartime are entitled to the types of rights referenced therein.  Moreover, other legislative materials explicitly justify the MCA's design as a

product of practical necessity.  See, e.g., S. Rep. No. 111-35, at 175–76 (July 2, 2009) (discussing

the MCA's aim to "bring[] procedures for military commissions in line with procedures governing

trial by courts-martial, except in cases where deviations are justified by practical need").  Hence,

Bin Lep has not clearly shown that he is likely to prevail on his equal protection claim.

## B.  Irreparable Harm

A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is likely in

the absence of an injunction."  Winter, 555 U.S. at 22.  The D.C. Circuit "has set a high standard

for irreparable injury."  Mexichem Specialty Resins, Inc. v. EPA, 787 F.3d 544, 555 (D.C. Cir.

2015) (citation omitted).  "[T]he alleged injury must be "certain, great, actual, and imminent," Hi-

Tech Pharmacal Co. v. FDA, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citing Wisconsin Gas Co. v.

FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)), and the requested "injunction must remedy present

harm, not prior injuries," Sierra Club v. U.S. Dep't of Energy, 825 F. Supp. 2d 142, 151 (D.D.C.

2011) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 109 (1998)).

Bin Lep's contentions that he "has suffered and will continue to suffer irreparable harm in

the absence of an injunction" overlap substantially with his arguments that the government's pre-

referral delay has deprived him of his rights to seek meaningful habeas review and release from

the PRB.  See Pet'r's Br. at 33.  For instance, he alleges that his ability to obtain habeas and PRB

relief has been irreparably harmed by the draft charges against him because: his "access to

numerous witnesses has effectively been denied"; repatriation negotiations with Malaysia have

stalled; and his participation in the PRB process has been "essentially preclude[d]" by his fears of

self-incrimination.  Id. at 33–34.  He also emphasizes that "numerous witnesses have passed

away," and that other evidence has spoiled while he has awaited prosecution.  Id. at 33.  However,

even assuming these harms can be attributed to the pending draft charges or the government's

delay, they have already occurred and cannot be remedied by an injunction at this stage.  See Sierra Club, 825 F. Supp. 2d at 151; see also Singh v. McConville, 187 F. Supp. 3d 152, 161–62 (D.D.C. 2016) (denying preliminary relief where plaintiffs alleged that they had suffered past delays, uncertainty, and pressure to forgo their constitutional rights).

Bin Lep does contend that the harms he has already experienced "will continue to increase in magnitude absent an injunction," Pet'r's Br. at 33, but he offers no proof to substantiate this claim.  See Davis v. Billington, 76 F. Supp. 3d 59, 65 (D.D.C. 2014) (denying preliminary injunction where plaintiff had "no concrete proof" that the harm he alleged would materialize). Bin Lep says that the witnesses he needs to secure his release will keep dying or suffer further memory loss.  See Pet'r's Br. at 33.  But his motion does not identify the names or circumstances of any specific witnesses whose health or memory is in particular, imminent jeopardy.  Thus, even considering "the ongoing pandemic and the 'high-risk' category of the elderly, previously tortured witnesses" who might be involved here, see Pet'r's Reply at 17, absent more specific evidence it cannot be "certain" that any existing witnesses who possess exculpatory information will forget that information or die before this Court resolves Bin Lep's habeas petition.  See Hi-Tech Pharmacal Co, 587 F. Supp. 2d at 11; see also Pan Am Flight 73 Liaison Grp. v. Davé, 711 F. Supp. 2d 13, 32 (D.D.C. 2010) ("Irreparable harm . . . cannot rest on mere possibilities."). Furthermore, to the extent that Bin Lep continues to believe that the government is unlawfully denying him access to witnesses, he may raise those discovery concerns in his habeas suit whether a preliminary injunction issues or not.

The requested injunction also appears unlikely to actually prevent the harms that Bin Lep says he will continue to suffer.  See Sierra Club, 825 F. Supp. 2d at 153 ("It would make little sense for a court to conclude that a plaintiff has shown irreparable harm when the relief sought

would not actually remedy that harm."). Bin Lep seeks a court order "to preserve the status quo and enjoin Respondents from unlawfully threatening to try him . . . or taking any further steps to unlawfully try him by military commission pending the resolution of his petition for a writ of habeas corpus." Pet'r's Mot. at 1. This type of relief certainly would not avert the deaths of witnesses or the spoliation of evidence that Bin Lep wishes to rely upon in his habeas and PRB cases. Nor would it remove the threat of prosecution that he faces. Bin Lep does not seem to be asking this Court to actually dismiss the draft charges against him—an act that, if taken, would go beyond merely "preserv[ing] the status quo." See id. But even if Bin Lep did intend as much, a preliminary injunction would not eliminate the government's interest in charging him. Rather, it would only pause efforts to prosecute him while this Court resolved his habeas petition. Therefore, any reluctance from the Malaysian government to negotiate his repatriation or to facilitate witness interviews might nonetheless persist until Bin Lep obtained permanent relief, as might his concerns about incriminating himself while litigating his habeas and PRB cases.

Finally, although Bin Lep asserts that he has suffered harm for years, he never sought to enjoin the government's attempts to prosecute him until now. Given this delay, the Court finds it difficult to conclude that any additional irreparable harm is now imminent. See Guttenberg v. Emery, 26 F. Supp. 3d 88, 103 (D.D.C. 2014) ("Plaintiffs' delay in requesting a preliminary injunction also weighs against a finding of irreparable harm here."); Arpaio v. Obama, 27 F. Supp. 3d 185, 210 (D.D.C. 2014) ("[P]laintiff cannot demonstrate irreparable harm since [he] waited two years to challenge the . . . program" he now seeks to enjoin.). Hence, even assuming Bin Lep could demonstrate a likelihood of success on the merits of his claims, the Court would nevertheless deny his requested injunction because he has not shown that he is likely to suffer irreparable harm in its absence.

**Conclusion**

Bin Lep has spent well over a decade awaiting prosecution for war crimes that he allegedly committed from 1996 to 2003.  And he offers a compelling, and at times disconcerting, description of "the state of limbo" he continues to endure with no clear end in sight.  See Pet'r's Br. at 21.  But the Court cannot conclude that Bin Lep has shown a sufficient likelihood of success on his unreasonable delay, speedy trial, or equal protection claims to warrant enjoining his potential prosecution at this time.  Nor can the Court find that Bin Lep will be irreparably harmed by the denial of preliminary relief.  The Court therefore need not address the other prongs of the preliminary injunction analysis.  See Greater New Orleans Fair Hous. Action Ctr., 639 F.3d at 1088; Chaplaincy of Full Gospel Churches, 454 F.3d at 297.  Hence, for the foregoing reasons, petitioner's motion for a preliminary injunction will be denied.  A separate order will be issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: December 14, 2020