**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**MOHAMMED NAZIR BIN LEP,**

    **Petitioner,**

       **v.**

**JOSEPH R. BIDEN JR., et al.,**

    **Respondents.**

**Civil Action No. 20-3344 (JDB)**

---

## <u>MEMORANDUM OPINION</u>

Before the Court are two motions—a motion for discovery filed by petitioner Mohammed Nazir Bin Lep and a motion to dismiss filed by respondents.  Bin Lep is currently detained at Guantanamo Bay due to his alleged participation in al-Qaeda operations against the United States. He has filed numerous petitions for habeas corpus over his two decades in U.S. custody, the latest of which was filed in November 2020 and raises 10 claims.  His case was referred to a military commission for proceedings in January 2021, and this Court held all but two of his habeas claims in abeyance pending the resolution of those proceedings.  In March 2022, Bin Lep filed a motion for discovery on those two live habeas claims, and in May 2022, respondents filed a motion asking the Court to either dismiss or grant judgment in their favor on those claims, or to hold them in abeyance.  For the reasons explained below, the Court will enter judgment in the government's favor as to Claim X; will dismiss any aspect of Claim IX challenging current or past conditions of confinement; will hold in abeyance any aspect of Claim IX challenging the factual predicate justifying his detention; and will accordingly deny the discovery motion as moot.

## Background

Bin Lep is a citizen of Malaysia who was seized by local authorities in Thailand on or around August 13, 2003 due to his alleged participation in al Qaeda operations against the United States.  See Pet. for a Writ of Habeas Corpus [ECF No. 40] ("Habeas Pet.") ¶¶ 8, 15–17.  He was then transferred to CIA custody, where he remained for the next three years in the CIA's now-defunct Rendition, Detention, and Interrogation ("RDI") program.  Id. ¶ 17.

Bin Lep is detained pursuant to the 2001 Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), which permits the United States to detain persons who were a part of or substantially supported al Qaeda.  Resp'ts' Mot. to Dismiss, for J., or to Abstain with Respect to Claims IX & X of the Pet. & Mem. in Supp. [ECF No. 113] ("Mot. to Dismiss") at 1. The government alleges Bin Lep joined al Qaeda and Jemaah Islamiyah (an associated force of al Qaeda), "received training from al Qaeda, swore an oath of loyalty to Usama bin Laden after the September 11, 2001 attacks, and agreed to participate in a martyrdom operation against the United States."  Id.  It also alleges he served in a role that facilitated the transfer of al Qaeda funds for use in bombing attacks against United States interests.  Id.

In 2006, Bin Lep was transferred to Department of Defense ("DoD") custody at the U.S. Naval Station in Guantanamo Bay, Cuba ("Guantanamo"), where he has remained to this day. Habeas Pet. ¶ 8.  He is one of 15 high-value detainees ("HVDs") currently detained at Guantanamo, out of a total detainee population of 31.[1]  Mot. to Dismiss at 1, 28; see Habeas Pet. ¶¶ 18–19.  In 2007, a Combatant Status Review Tribunal ("CSRT") classified Bin Lep as an

---

[1] Although the government's motion to dismiss states that there are 37 total detainees at Guantanamo, as of March 8, 2023, there are 31.  Press Release, U.S. Dep't of Defense, Guantanamo Bay Detainee Transfer Announced (Mar. 8, 2023), https://www.defense.gov/News/Releases/Release/Article/3323397/guantanamo-bay-detainee-transfer-announced/ (last accessed Mar. 30, 2023).

"Enemy Combatant" due to his participation in al Qaeda and its associated forces.  Habeas Pet. ¶ 20.

In 2009, Bin Lep filed his first writ of habeas corpus in federal court, Habeas Pet. ¶ 21; see Pet. for Writ of Habeas Corpus, Bin Lep v. Bush, 1:09-cv-00031-UNA (D.D.C. Jan. 8, 2009), ECF No. 1, which was ultimately dismissed without prejudice, Stipulation & Order, Bin Lep v. Bush, 1:09-cv-00031-UNA (D.D.C. Apr. 5, 2013), ECF No. 91.   In 2010, an interagency task force recommended that Bin Lep be prosecuted by a military commission. Habeas Pet. ¶ 22.   In December 2017, the Office of the Chief Prosecutor swore charges against Bin Lep, which were ultimately dismissed without prejudice.  Id. ¶ 24.  A second set of charges were sworn against Bin Lep in April 2019, but no action was taken at that time.  Id. ¶ 25.

In September 2019, Bin Lep filed another petition for habeas corpus in this Court.  See Notice of Filing, Bin Lep v. Trump, No. 19-cv-2799 (JDB) (D.D.C. Sept. 18, 2019), ECF No. 3. That petition was dismissed with prejudice as moot, but the Court granted Bin Lep leave to file another habeas petition.  Order, Bin Lep v. Trump, No. 19-cv-2799 (JDB) (D.D.C. Nov. 26, 2019), ECF No. 32.

Bin Lep filed his most recent petition for a writ of habeas corpus in November 2020, raising 10 grounds for relief.  Relevant here, Bin Lep claims that his designation as an HVD violates the Fifth and Eighth Amendments and the Detainee Treatment Act's ("DTA") prohibition on cruel and arbitrary punishment (Claim IX), Habeas Pet. ¶¶ 90–93, and that the government violated U.S. Army Regulation ("AR") 190-8 by "block[ing] any means by which [he] can properly . . . request" a mixed medical commission ("MMC") that could deem his repatriation to Malaysia necessary due to his allegedly poor health (Claim X), id. ¶¶ 94–96.

Bin Lep simultaneously requested a preliminary injunction to prevent the government from trying him before a military commission,[2] see Mot. for Prelim. Inj. [ECF No. 41], which the Court denied in December 2020, Dec. 14, 2020 Order [ECF No. 55].  One month later, the Office of Military Commissions referred sworn charges against Bin Lep and two co-defendants to a military commission.  Bin Lep, 2022 WL 123957, at *2.  The charges allege that Bin Lep was involved in orchestrating the bombing of nightclubs in Bali, Indonesia in 2002 and the bombing of a hotel in Jakarta, Indonesia in 2003.  Mot. to Dismiss at 2.

Then, in February 2021 the government moved to hold all Bin Lep's habeas claims in abeyance pending the resolution of his military commission proceedings.  See Resp'ts' Mot. to Hold Pet. in Abeyance Pending Completion of Military Commission Proceedings [ECF No. 62].  The Court ordered a stay of the habeas proceeding pending further developments in the military commission proceeding.  June 25, 2021 Order [ECF No. 85].  Then, on January 13, 2022, the Court granted the government's abeyance motion as to all Bin Lep's habeas claims except Claims IX and X.  Bin Lep, 2022 WL 123957, at *17.  The Court held that Claims I–VIII overlapped sufficiently with the nature of the military tribunal proceeding such that abstention principles counseled in favor of abeyance with respect to those claims.  Id. at *14–15.

But, on the record then before the Court, the Court held that the issues underlying Claims IX and X had not and could not be raised in the military commission proceedings and thus abstention was not warranted.  Bin Lep, 2022 WL 123957, at *15–16.  With respect to Claim IX, the Court noted that military commissions have disclaimed jurisdiction over claims pertaining to conditions of confinement and HVD status, and it thus concluded that abstention principles did not favor holding that claim in abeyance.  Id. at *15.  As for Claim X, the Court determined that "[t]he

_____

[2] At that time, the sworn charges against him had not yet been referred to a military commission.  Bin Lep v. Biden, Civ. A. No. 20-3344 (JDB), 2022 WL 123957, at *1 (D.D.C. Jan. 13, 2022).

government ha[d] not shown that the Court's adjudication of Bin Lep's entitlement to [an MMC] would require the Court to make findings about his mental state or would interfere with the military commission" and thus that abstention principles did not counsel against hearing the claim simultaneously with the military commission proceedings.  Id. at *16.

Bin Lep then filed the instant motion for discovery in March 2022 relating to Claims IX and X.  See Pet'r's Mot. for Disc. [ECF No. 107] ("Disc. Mot.").[3]  He requests five categories of information:  (1) exculpatory information, (2) conditions of confinement information, (3) information related to the high-value detainee policy, (4) information related to his designation as an HVD, and (5) identities of possible witnesses with knowledge of those topics.  See id. at 3–11.  The government opposes this request, primarily arguing that it is out of step with the approach taken in discovery in other Guantanamo cases and that discovery is premature at this juncture.  See Resp'ts' Opp'n to Disc. Mot. [ECF No. 112].  Bin Lep replied in support of his motion, see Pet'r's Reply in Supp. of Disc. Mot. [ECF No. 122], and the government filed a sur-reply, see Resp'ts' Sur-Reply in Opp'n to Disc. Mot. [ECF No. 126-1].

The government filed the instant motion to dismiss, for judgment, or to abstain with respect to Claims IX and X in May 2022.  Regarding Claim X, the government argues that the Court lacks jurisdiction because it is not a cognizable habeas claim, and that in any event, equitable principles counsel against the Court exercising jurisdiction and that Bin Lep is not entitled to an MMC.  See Mot. to Dismiss at 7–8.  As to Claim IX, the government primarily argues that Bin Lep's challenge to his HVD status (or any current or former conditions of confinement as a result of that status) are not cognizable habeas claims, and thus the Court lacks jurisdiction, or in the alternative, the merits of the claim relate to issues handled in the military commission proceedings and thus should

---

[3] References to this document cite the PDF pagination rather than the internal pagination.

be held in abeyance.  See id. at 26–28.  Bin Lep responded in opposition to the motion, mainly

arguing that the law of the case doctrine dictates that the Court already determined that it has

jurisdiction over Claims IX and X and that the government's motion is untimely under the Federal

Rules of Civil Procedure.  See Resp. in Opp'n to Mot. to Dismiss [ECF No. 123] ("Opp'n") at ii.

The government has filed a reply in support of its motion.  See Resp'ts' Reply in Supp. of Mot. to

Dismiss [ECF No. 127] ("Reply").

      Both motions are now ripe for decision.

## Analysis

### I.    Claim X: Mixed Medical Commission

      Bin Lep claims that he "should have access to a medical commission" per U.S Army

Regulation ("AR") 190-8 to determine his eligibility for medical repatriation due to the "physical

and mental harm" he has suffered while in custody.  Habeas Pet. ¶ 95.  Thus, he contends, the

government's refusal to convene an MMC for him violates that regulation.  Id.

      The government argues that this claim should either be dismissed or denied on the merits

and advances three arguments in support of its position.  See Mot. to Dismiss at 7.  First, the claim

"does not sound in habeas because it will not necessarily affect the fact, duration, or form of

Petitioner's confinement, particularly given that Petitioner is subject to ongoing military

commission proceedings," and the Court accordingly lacks subject-matter jurisdiction.  Id. at 8.

Second, even if the Court does have jurisdiction, "the Court should refrain from exercising any

authority to decide the claim as a matter of equity" because "[g]ranting [the] relief [Bin Lep seeks]

would be inconsistent with the great deference that the Judiciary affords the Executive on military

operations and treaty interpretation."  Id.  And third, Bin Lep is not entitled to an MMC in any

event because he is part of a nonstate terrorist organization.  Id.  Bin Lep disagrees on both substantive and procedural grounds.  See Opp'n at 13–17, 20–36, 38–40, 42, 43–45.

For the reasons explained below, the Court holds that it has subject-matter jurisdiction over Claim X but that the claim fails on the merits, and the Court will accordingly enter judgment in favor of the government.

### A.  Subject-Matter Jurisdiction

Federal courts have jurisdiction over actions filed by Guantanamo detainees only if they "sound in habeas corpus."  Aamer v. Obama ("Aamer I"), 742 F.3d 1023, 1030 (D.C. Cir. 2014) ("[I]f petitioners' claims do not sound in habeas, their challenges constitute an action other than habeas corpus barred by section 2241(e)(2)." (cleaned up)); see 28 U.S.C. § 2241(e)(2); see also Boumediene v. Bush, 553 U.S. 723, 792 (2008) (holding that statutory bar to Guantanamo detainees' habeas corpus claims in federal court is an unconstitutional suspension of the writ).  A Guantanamo detainee's claim need not be a "core" habeas claim (meaning a claim that challenges "petitioner's detention or the duration thereof") in order for a court to have subject-matter jurisdiction—the court's jurisdiction encompasses non-"core" habeas claims as well, such as a claim challenging a petitioner's transfer to another facility.  See Kiyemba v. Obama, 561 F.3d 509, 512 (D.C. Cir. 2009).

The government nevertheless argues that Department of Homeland Security v. Thuraissigiam, 140 S. Ct. 1959 (2020), forecloses Bin Lep's claim for an MMC.  Mot. to Dismiss at 16.  Thuraissigiam held that the Illegal Immigration Reform and Immigrant Responsibility Act, which restricted the ability of asylum-seekers to file habeas claims in federal courts seeking review of denial of their asylum applications, was not an unconstitutional suspension of the writ because "[h]abeas has traditionally been a means to secure release from unlawful detention, but respondent

invoke[d] the writ to achieve an entirely different end, namely, to obtain additional administrative review of his asylum claim and ultimately to obtain authorization to stay in this country." 140 S. Ct. at 1963. Thuraissigiam's requested relief—a re-review of his asylum application—would not have guaranteed that he would succeed on his application and receive asylum status. See id. at 1968. The government argues that this holding extends to Bin Lep's MMC claim because, like in Thuraissigiam, success on that claim "would only potentially result in release from custody." Mot. to Dismiss at 16.

In its effort to apply Thuraissigiam to this case, the government claims that decision's holding "teaches that a motion falls outside habeas when it seeks not actual release from such custody, but merely a new opportunity for administrative procedures potentially resulting in release, the claim Petitioner asserts here." Mot. to Dismiss at 16 (internal quotation marks omitted). But that characterization stretches Thuraissigiam too far. First, Thuraissigiam concerned an asylum-seeker—not a prisoner. See 140 S. Ct. at 1963. That is a critical distinction: the Court concluded that Thuraissigiam's argument was "doom[ed]" because he had not "shown that the writ of habeas corpus was understood at the time of the adoption of the Constitution to permit a petitioner to claim the right to enter or remain in a country or to obtain administrative review potentially leading to that result." Id. at 1969 (emphasis added). Thus, the government's description of the case is misleading. The Supreme Court was troubled by the fact that Thuraissigiam was not seeking release from custody—the core of a writ of habeas corpus—but rather another opportunity for his asylum application to be reviewed. See id. at 1969–71. Thus, the Court's reasoning did not actually hinge, as the government argues, on the fact that the relief sought would only "potentially result[] in release," Mot. to Dismiss at 16.

Here, unlike in <u>Thuraissigiam</u>, Bin Lep seeks an MMC that could decide to release him from custody.  <u>See</u> Habeas Pet. at 32 (requesting an MMC to "determine if Petitioner must be released").  The ultimate outcome of the relief Bin Lep seeks—no matter how tenuous or uncertain—is "simple release" from custody as contemplated by <u>Thuraissigiam</u>, 140 S. Ct. at 1971.  Moreover, it is well established that "habeas corpus relief is not limited to <u>immediate release</u> from . . . custody, but that the writ is available as well to <u>attack future confinement and obtain future releases</u>."  <u>Preiser v. Rodriguez</u>, 411 U.S. 475, 487 (1973) (emphases added).  In <u>Chatman-Bey v. Thornburgh</u>, the D.C. Circuit noted that the Supreme Court has "emphatic[ally] reject[ed] . . . the proposition that habeas would not lie if the relief granted would not result in the prisoner's immediate release" and held that habeas is the "appropriate vehicle" for a detainee who "maintain[s] that he is being deprived of the <u>chance</u> to secure his release."  864 F.2d 804, 807, 809 (D.C. Cir. 1988) (citing <u>Peyton v. Rowe</u>, 391 U.S. 54 (1968)).  Accordingly, the fact that Bin Lep seeks review by a body that only <u>may</u> result in his future release is not an obstacle to jurisdiction here.

In fact, another court in this District relied on this precedent to reject the government's argument that a Guantanamo detainee's request for an MMC did not sound in habeas because the relief was "probabilistic and discretionary."  <u>Al-Qahtani v. Trump</u>, 443 F. Supp. 3d 116, 127 (D.D.C. 2020).  In doing so, the <u>Al-Qahtani</u> court carefully distinguished another case in this District, <u>Salahi v. Obama</u>, Civ. A. No. 05-0569 (RCL), 2015 WL 9216557 (D.D.C. Dec. 17, 2015),[4] which held that a Guantanamo detainee's claim for a Periodic Review Board's consideration of his status did not sound in habeas because there was too much discretion involved

---

[4] <u>Salahi</u> was decided before <u>Thuraissigiam</u> in a context entirely separate from that present here.

in the Secretary of Defense's ultimate decision to accept the Board's recommendation to grant

release.  See 443 F. Supp. 3d at 126–28.  In its analysis, the Al-Qahtani court emphasized that

> a mixed medical commission review [is] quite distinct from a Periodic Review
> Board: if certain criteria are met, the detained individual must be released.  A mixed
> medical commission is designed to make findings about the health of an individual;
> those findings lead to a result certain, not an exercise of discretion.  The review will
> result in [the detainee]'s release or not, which is at the core of habeas.

Id. at 127.  Ultimately, the court held that "a request for review by a mixed medical commission

is a request for release" and that the petitioner's "motion fit[] squarely into th[at] Court's habeas

jurisdiction."  Id. at 129 (internal quotation marks omitted).

Notwithstanding this case that found an identical claim to sound in habeas, the government

argues that Al-Qahtani is no longer good law after Thuraissigiam.  See Mot. to Dismiss at 16–17.

However, as discussed above, Thuraissigiam does not affect Al-Qahtani's holding because it

stands only for the proposition that the right to administrative review of an application for asylum

is not within the scope of relief contemplated by habeas corpus, not that claims for uncertain future

release from custody are not cognizable.

The government further attempts to undermine Al-Qahtani by arguing that its

characterization of an MMC as a request for release is incorrect "even under the precedents that

led up to Thuraissigiam."  Mot. to Dismiss at 17.  The government then lists a handful of cases it

claims stand for the proposition that a prisoner's claim that would not necessarily result in relief

is not cognizable in habeas.  See id. (collecting cases).  But these cases are inapposite here as they

all concern whether a "claim that may be brought under § 1983 need . . . be brought first in

habeas."  Al-Qahtani, 443 F. Supp. 3d at 127.

Taking each case in turn, the government states that Skinner v. Switzer, 562 U.S. 521

(2011), held that "'when a prisoner's claim would not "necessarily spell speedier release,"' the

claim is not cognizable under habeas." Mot. to Dismiss at 17 (emphasis omitted) (quoting Skinner, 562 U.S. at 535 n.13). But the government omits important context for that quote: "**Habeas is the exclusive remedy, we reaffirmed, for the prisoner who seeks 'immediate or speedier release' from confinement.** Where the prisoner's claim would not 'necessarily spell speedier release,' however, **suit <u>may</u> be brought under § 1983**." Skinner, 562 U.S. at 525 (bolding and underlined emphases added) (citation omitted). The issue in Skinner, then, was whether a postconviction claim for DNA testing could be brought in a § 1983 action <u>at all</u>, or whether it was cognizable in federal court <u>only</u> through a writ of habeas corpus—not whether such a claim sounds in habeas. See id. at 524–25.

The government's reliance on Wilkinson v. Dotson is similarly misguided—that case held that state prisoners did not have to seek relief exclusively through a writ of habeas corpus when challenging the constitutionality of a state's parole procedures and that they may instead bring that claim under § 1983. See 544 U.S. 74, 76 (2005). The Wilkinson Court did note that "claims for <u>future</u> relief (which, if successful, will not necessarily imply the invalidity of confinement or shorten its duration) are yet more distant from that core [of habeas]." Id. at 82. But Guantanamo detainees are not restricted to bringing only core habeas claims. Kiyemba, 561 F.3d at 512–13. And in Wilkinson, the petitioners' ultimate release depended on the discretion of a parole review board, see 544 U.S. at 82, which is more analogous to a Periodic Review Board as discussed in Al-Qahtani than to an MMC, which exercises much less discretion.

Likewise, in Muhammad v. Close, the Court held that the requirement to exhaust habeas before bringing a § 1983 claim is not implicated when the prisoner's challenge "threatens no consequence for his conviction or the duration of his sentence." 540 U.S. 749, 751 (2004) (per curiam). There, a prisoner was found guilty of an infraction stemming from a physical altercation

with a prison official that resulted in an additional seven days' detention and suspension of certain privileges for 30 days.  <u>See</u> <u>id.</u> at 752.  The prisoner then brought a § 1983 action against the official alleging retaliation.  <u>Id.</u> at 753.  Notably, the prisoner did not challenge the conviction for the infraction itself and only sought relief in the form of damages.  <u>See</u> <u>id.</u>  The Court determined that the prisoner "raised no claim on which habeas relief could have been granted on any recognized theory" and thus that he could proceed under § 1983 without first exhausting habeas. <u>See</u> <u>id.</u> at 755.  Thus, the government's description of this case—"inmate 'raised no claim on which habeas relief could have been granted on any recognized theory' where he challenged 'prison disciplinary proceedings' that 'may' have 'affect[ed]' the duration of time to be served 'but "not necessarily so"'"—is quite misleading.  Mot. to Dismiss at 17 (alteration in original) (quoting <u>Muhammad</u>, 540 U.S. at 754–55).  The prisoner only sought damages and did not challenge the underlying disciplinary action that resulted in an extension of the duration of his confinement, a situation quite different from the case at bar.

And in <u>Davis v. U.S. Sentencing Commission</u>, the D.C. Circuit held that a prisoner was not required to bring his claim seeking a declaratory judgment that amendments to the Sentencing Guidelines denied him equal protection in a petition for writ of habeas corpus.  <u>See</u> 716 F.3d 660, 661–62 (D.C. Cir. 2013).  In reaching this conclusion, the court reasoned that an equal protection challenge to Guidelines amendments is not a core habeas claim because success on the claim "would do no more than allow [the prisoner] to seek a sentence reduction, which the district court retains the discretion to deny."  <u>Id.</u> at 666.  First, as noted above, Guantanamo detainees can bring non-core habeas claims in federal court.  <u>See</u> <u>Kiyemba</u>, 561 F.3d at 512–13.  Moreover, the instant case involves much less discretion relevant to achieving release from custody than the relief at issue in <u>Davis</u>.  <u>See</u> <u>Al-Qahtani</u>, 443 F. Supp. 3d at 127 ("A mixed medical commission is designed

12

to make findings about the health of an individual; those findings lead to a result certain, not an exercise of discretion.").

Thus, based on the above survey of relevant precedent, the Court determines that Bin Lep's claim for an MMC sounds in habeas corpus and accordingly this Court has subject-matter jurisdiction over it.[5]

## B. Procedural Arguments

Bin Lep makes a series of procedural arguments contending that the Court cannot rule on the government's motion as to Claim X at this point in the litigation.[6]  He argues that because the government is asking the Court to rule that he is not entitled to an MMC on the merits, and relies on materials outside the pleadings in doing so, the motion is one for an unspecified type of judgment rather than a motion to dismiss.  See Opp'n at 10–11.  He contends that whether the Court construes this request as a motion for judgment on the pleadings under Rule 12(c), a motion for summary judgment under Rule 56, or a motion for judgment on the record under the Case Management Order ("CMO"), it must deny the motion because a motion for judgment on the

---

[5] Bin Lep raises two additional arguments against the government's motion to dismiss for lack of subject-matter jurisdiction.  He first argues that the Court previously decided it has subject-matter jurisdiction over Claim X, so law of the case doctrine dictates that the Court is bound by its previous determination.  See Opp'n at 13–17.  Although the Court has doubts about whether it has actually previously decided that it has subject-matter jurisdiction on Claim X, it is not necessary for the Court to reach that issue here, given that it now determines that it has subject-matter jurisdiction over Claim X.

He also argues that "[t]o the extent the Court wishes to consider the new declarations or exhibits in adjudicating the 12(b)(1) Dismissal Arguments[,] . . . those arguments can only be construed as a Rule 56 motion for summary judgment."  Opp'n at 17.  But the Court has determined that it has subject-matter jurisdiction over Bin Lep's Claim X under the 12(b) standard, without taking matters outside of the pleadings into consideration.  And even if the Court did take matters outside the pleadings into account, that would not run afoul of Rule 12(b)(1), as the Court "may consider material other than the allegations in the habeas petition in determining whether it has jurisdiction to hear the case, so long as it still accepts the factual allegations in the habeas petition as true."  Hamidullah v. Obama, 899 F. Supp. 2d 3, 7 (D.D.C. 2012).

[6] Bin Lep opposes the government's motion as to Claim X only on procedural grounds.  He does not directly respond to the government's arguments on the merits as to why he is not entitled to an MMC.

record or on the pleadings is premature, and a motion for summary judgment is inappropriate while discovery is still ongoing and facts remain in dispute.  See id. at 31.

Bin Lep asserts that the pleadings are not yet closed because he has yet to file his traverse. Opp'n at 32.  A traverse, which is mandatory in Guantanamo proceedings, is filed by the petitioner at the close of discovery.  Id.  Bin Lep suggests that the traverse is analogous to an answer under Federal Rule of Civil Procedure 7(a).  See id.  Accordingly, until he files his traverse, he contends "[i]t would be both inappropriate and inequitable to allow Respondents to proceed with judgment on the pleadings before the pleading[s] are complete and during the pendency of a discovery process to which they have consented."  Id. at 33.

Bin Lep also argues that summary judgment under Rule 56 or judgment on the record under the CMO would be inappropriate here.  Opp'n at 33.  Judgment on the record available under the CMO cannot occur until after the traverse is filed.  Id.  And although a party may file for summary judgment at any time until 30 days after the close of discovery, "Respondents have not attempted to make th[e] [required] factual showing" that there are no general material disputes of fact.  Id. at 34, 36.  Bin Lep notes, for example, that the parties disagree about certain aspects of the medical care at Guantanamo.  See id. at 38–39.  Further, he contends that deciding a motion for summary judgment before he has received all requested discovery from the government would be inequitable.  See id. at 34–35.

The government opposes Bin Lep's procedural arguments.  It contends that Bin Lep's "effort to reframe this action as a routine civil case governed by the Rules is incorrect."  Reply at 6.  The government cites Al-Bihani v. Obama, 590 F.3d 866 (D.C. Cir. 2010), which states that "[h]abeas review for Guantanamo detainees need not match the procedures developed by Congress and the courts specifically for habeas challenges to criminal convictions."  Id. at 876.  Another

judge in this District has also considered matters outside the pleadings when deciding a motion to dismiss in a habeas context.  In Abdulrazzaq v. Trump, the court considered material attached to the petitioner's opposition briefing in deciding a motion to dismiss, noting that "[t]he Supreme Court has provided scant guidance on [what procedure is due to detainees challenging their detention in habeas corpus proceedings], consciously leaving the contours of the substantive and procedural law of detention open for lower courts to shape in a common law fashion."  422 F. Supp. 3d 281, 287 n.4 (D.D.C. 2019) (alteration in original) (quoting Al-Bihani, 590 F.3d at 870). That court also noted that courts are "not restricted to follow the standard for addressing motions to dismiss . . . as required in a civil action outside of the habeas context."  Id. (quoting Al Kandari v. United States, No. 15-cv-329 (CKK), slip op. at 11 (D.D.C. Aug. 31, 2015)).  And, in any event, even if the Court construed this motion as one for summary judgment, the government argues that "Petitioner fails to describe any disputed material fact or need for discovery precluding decision in Respondents' favor.  Petitioner once again invokes an alleged dispute over the quality of medical care provided [to] Petitioner by the medical staff at Guantanamo," which is "immaterial to the legal entitlement question."  Reply at 16.

Whether Bin Lep is entitled to an MMC is a pure legal issue.  The determination does not depend on any facts not known to the parties at this time.  The parties' disagreements about certain aspects of the medical care at Guantanamo, for example, are not material disputes because the nature of the medical care at Guantanamo has nothing to do with whether the relevant authorities afford Bin Lep entitlement to an MMC, as discussed further below.  Moreover, the Court is not persuaded by Bin Lep's procedural arguments that the Federal Rules of Civil Procedure apply rigidly in this context.  The traverse is not akin to an answer in a typical civil case, and, in any event, the information in the traverse will not affect the outcome of this issue.  Discovery on these

issues also will not affect the merits of this claim. Thus, the Court sees no reason to delay resolving this legal claim now and accordingly concludes that treating the government's motion as one seeking judgment is appropriate.

### C.  Entitlement to a Mixed Medical Commission

Having resolved the parties' jurisdictional and procedural arguments, the Court will now turn to the merits of whether Bin Lep is entitled to an MMC as a matter of law.  See Mot. to Dismiss at 22–26.

AR 190-8 implements parts of the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 ("Third Geneva Convention"), which offers certain protections to some categories of enemy combatants detained during armed conflicts.  Mot. to Dismiss at 10 (citing AR 190-8 § 1-1(b), available at https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/r190_8.pdf (last accessed Mar. 30, 2023)).  Most of the Third Geneva Convention's protections apply only in the context of international armed conflicts, defined as "all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties."  Third Geneva Convention art. 2.  The classification of an armed conflict as international or non-international is important because the Third Geneva Convention affords fewer protections to enemy combatants captured during an "armed conflict not of an international character."  Id. art. 3.

One protection of the Third Geneva Convention is prisoner-of-war status, which only applies in international armed conflicts and is given to

> (1) members of the armed forces of a state that is a party to the conflict as well as members of militias or volunteer corps forming part of such armed forces, and (2) members of other militias or volunteer corps belonging to a state that is party to the conflict that are commanded by a responsible superior officer, have fixed distinctive insignia, carry arms openly, and conduct their operations in accordance

16

with the laws of war, including by refraining from conducting attacks against
civilians.

Mot. to Dismiss at 10–11 (citing Third Geneva Convention art. 4(A)(1)–(2)).   In addition,
provisional prisoner-of-war status is afforded to enemy combatants detained during an
international armed conflict, when there is doubt about whether they are entitled to full prisoner-
of-war status, only until their eligibility can be "determined by a competent tribunal."   Third
Geneva Convention art. 5.   One prerogative afforded to prisoners of war under the Third Geneva
Convention is that a "Mixed Medical Commission[] shall be appointed to examine sick and
wounded prisoners of war[] and to make all appropriate decisions regarding them."   Id. art. 112.

AR 190-8 implements these protections, including the right to an MMC.   The regulation
applies to, among other classifications, "enemy prisoners of war," which is "[a] detained person
as defined in Articles 4 and 5 of the [Third Geneva Convention]," AR 190-8 at 33, and "other
detainees," id. § 1-1(a).   An "other detainee" is defined as a "[p]erson[] in the custody of the U.S.
Armed Forces who ha[s] not been classified as" an enemy prisoner of war ("EPW"), retained
personnel, or civilian internee, and who "shall be treated as [an] EPW[] until a legal status is
ascertained by competent authority."   Id. at 33 (citations omitted).

The government argues that Bin Lep is not entitled to an MMC under AR 190-8.   Because
al Qaeda is a non-state terrorist organization and is thus not a party to the Third Geneva
Convention, Bin Lep—a member of al Qaeda—was not detained during an "international armed
conflict" and accordingly cannot be an enemy prisoner of war.   See Mot. to Dismiss at 22–24.   The
government contends that Bin Lep is also not eligible for the interim "other detainee" status
because that status is provided "in accordance with Article 5" of the Third Geneva Convention,
which applies solely to enemies captured during international armed conflicts.   See id. at 23
(quoting AR 190-8 § 1-6(a)) (citing Third Geneva Convention arts. 4–5).   Enemies captured during

17

a non-international armed conflict, however, are afforded <u>only</u> the protections outlined in Article 3 of the Third Geneva Convention, not the full suite of protections guaranteed in the other portions of the treaty.  The government also cites a DoD directive that states that "the provisional prisoner-of-war protection provided by Article 5 of the Convention only applies in the context of international armed conflicts."  Mot. to Dismiss at 24.  The directive notes that

> [d]uring international armed conflict, should any doubt arise as to whether a detainee belongs to any of the categories enumerated in Article 4 of the Geneva Convention Relative to the Treatment of Prisoners of War and as such is entitled to the protections and privileges afforded EPWs, such detainees will be treated as EPWs until a tribunal convened in accordance with Article 5 of the Geneva Convention Relative to the Treatment of Prisoners of War, determines the detainee's status under the law of war.

DoD Directive 2310.01E § 3.8 (Mar. 15, 2022) (emphasis added).

The government lastly contends that, notwithstanding whether the "other detainee" classification applies to those detained during non-international armed conflicts, Bin Lep is not entitled to an MMC because his status has already been determined.  <u>See</u> Mot. to Dismiss at 24–26.  The government cites a statement by then-President George W. Bush establishing that "because al-Qaida is a terrorist organization that is not and cannot be a party to the Third Geneva Convention, al-Qaida's members are unprivileged enemy combatants to whom the full protections of the Geneva Convention do not apply."  <u>Id.</u> at 24 (citing Statement by the Press Secretary on the Geneva Convention, The White House, Off. of the Press Sec'y (Feb 7, 2002)).[7]  And Bin Lep was determined to be an enemy combatant—that is, a member of al Qaeda—by a CSRT in 2007.  <u>See</u> Ex. A to Mot. to Dismiss [ECF No. 113-1] (designating Bin Lep an enemy combatant); Ex. B to Mot. to Dismiss [ECF No. 113-2] (finding that Bin Lep "was part of and supporting al Qaida and

---

[7] The D.C. Circuit has held that "[n]othing in the regulations . . . suggests that the President is not a 'competent authority'" for the purposes of determining the status of Guantanamo detainees.  <u>Hamdan v. Rumsfeld</u>, 415 F.3d 33, 43 (D.C. Cir. 2005), <u>rev'd and remanded on other grounds</u>, 548 U.S. 557 (2006).

associated forces"); Ex. C to Mot. to Dismiss at 1 [ECF No. 113-3] (same).  The government also cites a memorandum from the Secretary of the Army confirming that enemy detainees at Guantanamo are not entitled to the fuller protections of the Third Geneva Convention.  See Mot. to Dismiss at 25–26 (citing Ex. D to Mot. to Dismiss [ECF No. 113-4])).

Although Bin Lep did not respond to the merits of the government's claim, another court in this District has already considered this question and rejected the government's argument.  In Al-Qahtani, the court held that a Guantanamo prisoner was properly categorized as an "other detainee" and thus entitled to an MMC.  See 443 F. Supp. 3d at 130.  That court rejected the government's argument that the petitioner's status as an "enemy combatant" precluded him from being an "other detainee" as defined in AR 190-8.  See id.  The court instead adopted petitioner's argument that "as an 'enemy combatant,' a descriptor not found in Army Regulation 190-8, he remains an 'other detainee' for the purposes of the Regulation and is, by its terms, entitled to be treated as a prisoner of war."  Id.

The Al-Qahtani court found support in Aamer v. Obama (Aamer II), 58 F. Supp. 3d 16 (D.D.C. 2014), and Al Warafi v. Obama, 716 F.3d 627 (D.C. Cir. 2013).  The Aamer II court considered the issue, noting in dictum that the "contention that Petitioner's designation as an 'enemy combatant' by a CSRT precludes him from being treated as an 'other detainee' under Army Regulation 190–8" is "questionable."  58 F. Supp. 3d at 25.  The court observed that the Al Warafi court considered the same issue and determined that despite petitioner's designation as an "enemy combatant," he still qualified as a "medic" under AR 190-8.  Id. (citing Al Warafi, 716 F.3d at 627–29).  Thus, the Aamer II court reasoned that

> [i]f Respondents are correct that an "enemy combatant" designation removes Guantanamo detainees from the coverage of Army Regulation 190–8, there would have been no need for the al Warafi[] court to conduct such an analysis.  In light of

these precedents, Respondents put more weight on "enemy combatant" than the
term can bear.

Id.  While Aamer II ultimately held that the petitioner in that case was not an "other detainee" for
separate reasons, the Al-Qahtani court relied on this reasoning to conclude that "Mr. al-Qahtani
meets the criteria for an 'other detainee' in Army Regulation 190-8: he is a person in the custody
of the United States and he has not been otherwise classified as either an enemy prisoner of war,
retained person, or civilian internee."  443 F. Supp. 3d at 130.

But as the government notes, the Al-Qahtani court's relatively brief consideration of the
question did not consider a critical issue: it  "never addressed the Convention's distinction between
international and non-international armed conflicts or between the requirements of Convention
Article 3 and prisoner-of-war privileges."  Mot. to Dismiss at 15.  That did not appear to be an
issue argued by either party in that case, and the Al-Qahtani court thus did not have the benefit of
briefing on that issue.  Moreover, the Al-Qahtani court's decision logically flows from its
presumption at the time that a Guantanamo prisoner must fall into one of four categories: enemy
prisoner of war, retained person, civilian internee, or other detainee.  See 443 F. Supp. 3d at 130
(finding the petitioner was properly classified as an "other detainee" because  "he [wa]s a person
in the custody of the United States and he ha[d] not been otherwise classified as either an enemy
prisoner of war, retained person, or civilian internee").  But with the benefit of briefing on the
issue, the Court disagrees with that presumption and comes to a different conclusion regarding the
availability of MMCs to detainees captured during a non-international conflict.

Because Guantanamo detainees were not captured in the context of an international armed
conflict under the Third Geneva Convention's definition of that term, but rather during a non-
international one, they are not prisoners of war and cannot be "other detainees" because those
classifications are only available to those detained during international armed conflicts.  As the

Court sees it, that context removes Guantanamo detainees from the broad protections of the Third Geneva Convention, granting them only the narrower set of protections in Article 3. An MMC is only available to prisoners of war captured during an international armed conflict under the Third Geneva Convention, and it is not part of the baseline protections outlined in Article 3 that attach for non-prisoners of war captured during a non-international conflict. Moreover, AR 190-8 § 3-12, the implementing provision, makes clear that an MMC is only available to enemy prisoners of war and retained personnel who have applied for it. The Court accordingly concludes that Bin Lep is not entitled to an MMC under the relevant governing treaty and implementing regulation and will grant judgment in favor of the government on Claim X.

## II.    Claim IX: High Value Detainee Designation

Bin Lep also challenges his designation as an HVD and the conditions of confinement associated with that status. See Habeas Pet. ¶¶ 90–93. He argues that this classification violates the Fifth and Eighth Amendments' prohibitions on "arbitrary imposition of punishment not authorized by law" and the DTA's prohibition on cruel and unusual punishment. See id. Bin Lep contends that

> Respondents' continuing designation of Petitioner as a HVD imposes direct, material, and significant burdens on his conditions of confinement and his access to counsel. Respondents' imposition of this label on Petitioner based upon not anything he has done but on its decision to subject him to 'enhanced interrogation techniques' is an arbitrary and capricious imposition upon his liberty interest.

Id. ¶ 93. Specifically, Bin Lep alleges that the HVD designation results in conditions of confinement that restrict his ability to access counsel and contact his family members. See id. ¶ 19.

The government argues that the Court should either dismiss, grant judgment in its favor on, or hold in abeyance this claim regarding Bin Lep's HVD designation. Mot. to Dismiss at 26.

The government construes Bin Lep's claim as a challenge to the factual predicate for his initial detention and to "his past treatment in CIA and DoD custody and his current conditions of confinement."  Id. at 27.  The government thus urges that Bin Lep's "conception of the HVD designation, as relevant to any potentially proper habeas corpus claim under the law of this Circuit, is incorrect."  Id.  His designation as an HVD, the government explains, "is not correlated to his factual basis for detention"; rather, his designation is a result of his prior detention in the CIA's former RDI program.  Id.  "HVDs, such as Petitioner, are in the unique position of potentially possessing information relating to the RDI program that remains classified up to the TOP SECRET level[,] that is, involving the potential for exceptionally grave damage to national security."  Id. at 28–29.  Because Bin Lep may have "learned or discerned highly sensitive classified information" through that program, there are information-security measures associated with the HVD status to ensure that any top secret information Bin Lep has knowledge of is protected.  See id. at 27.  Because this designation is related to a legitimate government interest, the government believes it is entitled to judgment on that claim.  Id.  Moreover, to the extent Bin Lep challenges his past conditions of detention in CIA or DoD custody, the government argues that is not a cognizable basis for a habeas claim and/or overlaps with issues being considered by the military tribunal, so the Court should either dismiss the claim for lack of jurisdiction or hold it in abeyance pending the resolution of the military commission proceedings.  See id. at 27–28.

For the reasons explained below, the Court will dismiss any aspect of Claim IX challenging current or past conditions of confinement and will hold in abeyance any aspect of Claim IX that challenges the factual predicate for his detention, placement in the RDI program, and associated HVD designation.

### A.  Current Conditions of Confinement

Bin Lep challenges his current conditions of confinement resulting from his HVD designation under the Fifth Amendment, the Eighth Amendment, and the DTA.  <u>See</u> Habeas Pet. ¶¶ 90–93.  The government urges that, under each of these bases, the Court should either dismiss the claim under Rule 12(b)(6) or enter judgment in the government's favor.  <u>See</u> Mot. to Dismiss at 28–43.

#### i.  <u>Procedural Arguments</u>

Bin Lep first argues that the government's motion for dismissal under Rule 12(b)(6) is not procedurally proper at this stage of the litigation: "because Respondents failed to present the Dismissal Arguments attacking the legal sufficiency of Petitioner's claims in their Factual Return or their various motions preceding that Return, those arguments may no longer be raised in a 12(b) motion to dismiss."  Opp'n at 26.  Under Rule 12(b), motions to dismiss "must be made before pleading if a responsive pleading is allowed."  The government opposes Bin Lep's procedural arguments, first noting that Bin Lep's "effort to reframe this action as a routine civil case governed by the Rules is incorrect."  Reply at 6.  The government also notes the context in which the factual return was filed supports that it is distinguishable from an answer in a typical civil case.  Here, the Court ordered the government to file an updated factual return while the remainder of the proceedings were stayed.  <u>See</u> June 25, 2021 Order [ECF No. 85].  In response to the government's objections to that Order, this Court reasoned that

> [t]he evidence supporting Bin Lep's detention concerns events that transpired nearly two decades ago and will continue to grow stale if the due date for the factual return is further delayed.  Moreover, while some time and resources are, of course, involved in filing any factual return, here the government need only <u>update</u> the 2009 version of the factual return, which it has said it can do in "reasonably short order."  . . . The Court will not at this time "churn" over the material in the factual return or issue any rulings with respect to the evidence contained therein.  It will only require the government to fulfill its obligation to disclose the factual basis for Bin Lep's detention under the AUMF.

Bin Lep v. Biden, Civ. A. No. 20-3344 (JDB), 2021 WL 2634663, at *10–11 (D.D.C. June 25, 2021).  Thus, as the government puts it, "[i]n such circumstances, Petitioner's contention that Respondents were obligated, prior to filing the Factual Return, to raise their arguments for dismissal of Claims IX and X" is unreasonable.  Reply at 12–13.  The Court agrees, especially in light of the flexible nature of habeas proceedings.  See Al-Bihani, 590 F.3d at 876 ("Habeas review for Guantanamo detainees need not match the procedures developed by Congress and the courts specifically for habeas challenges to criminal convictions."); see also supra pp. 14–15.  The Court accordingly concludes that dismissal under Rule 12(b)(6) is not procedurally improper at this juncture.

> ii.   Eighth Amendment and DTA Claims

Bin Lep challenges under the Eighth Amendment and the DTA his current conditions of confinement imposed pursuant to his HVD designation.  See Habeas Pet. ¶¶ 90–93.  It is first worth noting that the DTA does not provide a private cause of action.  Doe v. Rumsfeld, 683 F.3d 390, 397 (D.C. Cir. 2012) ("[T]he DTA created no private cause of action.  Neither in that Act nor any other has Congress extended a cause of action for detainees to sue federal military and government officials in federal court for their treatment while in detention.").  And while there may be some controversy as to whether the Eighth Amendment applies to Guantanamo detainees, see Al Bahlul v. United States, 603 F. Supp. 3d 1151 (U.S.C.M.C.R. 2022) ("We note the unresolved controversy over whether the Eighth Amendment applies to prisoners at Guantanamo Bay, Cuba." (citing Ali v. Rumsfeld, 649 F.3d 762, 770–72 (D.C. Cir. 2011)), another court in this District recently determined that in a Guantanamo habeas case challenging conditions of confinement, "[t]here [wa]s no dispute as to whether [and Eighth Amendment] claim is properly before the Court: a person 'in custody may challenge the conditions of his confinement in a petition for habeas

corpus.'"  Abdulrazzaq v. Trump, 422 F. Supp. 3d 281, 286 (D.D.C. 2019) (quoting Aamer I, 742 F.3d at 1032).

But Bin Lep has not sufficiently pled an Eighth Amendment claim based on his conditions of confinement.  At the outset, it is not entirely clear whether Guantanamo detainees should be viewed as pretrial detainees or convicted prisoners under the Eighth Amendment—an important distinction, as the classifications carry different standards.  See Brogsdale v. Barry, 926 F.2d 1184, 1187 n.4 (D.C. Cir. 1991) ("[T]he threshold for establishing a constitutional violation is clearly lower for the pretrial detainees.").  For pretrial detainees, "the question is whether prison conditions 'amount to punishment of the detainee.'  A condition may amount to punishment if it 'is not reasonably related to a legitimate [institutional] goal—if it is arbitrary or purposeless.'"  Id. (quoting Bell v. Wolfish, 441 U.S. 520, 535, 539 (1979)).  "For convicted prisoners, the question is not whether prison conditions amount to punishment—for convicts plainly may be punished—but rather whether the conditions 'deprive inmates of the minimal civilized measure of life's necessities.'"  Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).  Although the government contends that the latter standard is more suitable here, see Mot. to Dismiss at 35 ("Given the requirement in Article 3 of the Geneva Convention that detainees such as Petitioner be treated humanely, the . . . standard for [convicted criminals] would seem the most apt with respect to HVD conditions." (citation omitted)), the Court need not decide this question as Bin Lep's claim fails under either standard.

For convicted criminals, "extreme deprivations are required to make out a conditions-of-confinement claim [under the Eighth Amendment]. . . .  [O]nly those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."  Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal quotation marks and

citation omitted).  Bin Lep alleges that his HVD status "has a direct impact on his access to counsel and his conditions of confinement."  Habeas Pet. ¶ 19.  Specifically, he complains that "[t]he attorneys and staff of HVDs require TS/SCI/SAP clearances to meet their clients, and must comply with separate and more onerous handling requirements under this Court's protective order than those which govern counsel for Low Value Detainees."  Id.  He also alleges that the conditions of his confinement in the HVD camp are "much harsher" than those in the other camp because "the Government has insisted on more restrictive conditions on Petitioner's contact with family members, which is extremely limited and mediated through unreliable technology."  Id.  Even taking Bin Lep's allegations as true and viewing them in the light most favorable to him, these alleged conditions are not "extreme deprivations" necessary to make out an Eighth Amendment claim.  "Deprivations such as infrequent or no visits from family . . . simply do not meet the threshold of 'extreme deprivations' required to state an Eighth Amendment claim regarding conditions of prison confinement."  Simmons v. Wolff, 594 F. Supp. 2d 6, 9 (D.D.C. 2009).

Pretrial detainees, on the other hand, must show that the challenged conditions are "arbitrary or purposeless"—that is, not "reasonably related to a legitimate goal."  Bell, 441 U.S. at 539.  "Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'"  Id.  The only allegation on the face of Bin Lep's habeas petition related to the arbitrariness of the HVD designation is that "Respondents' imposition of this label on Petitioner [is not] based upon . . . anything he has done but on its decision to subject him to 'enhanced interrogation techniques'" and therefore "is an arbitrary and capricious imposition upon his liberty interests."  Habeas Pet. ¶ 93.  But even taking this allegation as true, it does not state a claim for an Eighth Amendment violation.  A designation need not be based on something the detainee "has done" in

order to be reasonably related to a government objective, and a designation based on something other than what the detainee "has done" is not necessarily arbitrary.  Thus, without more, the allegation is merely conclusory, which is insufficient to state a claim.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

To be sure, Bin Lep makes more detailed allegations in his brief about the arbitrariness of the HVD designation, specifically "that the creation of the High-Value Detainee designation bore no relationship to any penological interest but was instead designed to conceal evidence of crimes." Opp'n at 37.  But he did not make these allegations in his habeas petition, as he claims in his brief. See id. ("Petitioner has plausibly alleged [this], in reliance on publicly available records . . . ."). The Court cannot consider allegations outside the pleadings in a motion to dismiss.

But even if it did, Bin Lep's claim in his briefing that the classification was designed to "conceal evidence of crimes" is not supported by any further detail or explanation beyond one additional allegation: that a certain government agent, when discussing a different Guantanamo detainee who was classified as an HVD, stated in 2002 that said detainee "should remain incommunicado" for the rest his life.  Id. (quoting Senate Select Committee on Intelligence, Committee Study of the CIA's Detention and Interrogation Program 35 (2014)).  Presumably, Bin Lep wants the Court to draw the inference that all HVDs were so designated to ensure that they could not speak about any potential mistreatment while in the RDI program.  But that inference runs counter to the facts alleged: Bin Lep acknowledges that he has access to counsel and communication with family despite having to go through additional procedures to speak with them. Habeas Pet. ¶ 19.  And the facts alleged in his petition about his ability to communicate—for example, that his attorneys must have a top secret clearance, id.—have a more "obvious alternative

explanation," <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 567 (2007): the government's designation

of those formerly in the RDI program as HVDs was due to information-security concerns, <u>see</u> <u>infra</u>

p. 28 n.8.  <u>Cf.</u> <u>Twombly</u>, 550 U.S. at 567 (finding an allegation of illicit activity insufficient to

state a claim because there was an "obvious" and "natural" "alternative explanation" for the

conduct).  At bottom, Bin Lep merely raises in his brief the possibility of an improper purpose, but

that does not pass muster at this stage as he has "not nudged [his] claims across the line from

conceivable to plausible," <u>id.</u> at 570.  "[W]here the well-pleaded facts do not permit the court to

infer more than the <u>mere possibility</u> of misconduct, the complaint has alleged—but it has not

'show[n]'—'that the pleader is entitled to relief.'"  <u>Iqbal</u>, 556 U.S. at 679 (quoting Fed. R. Civ. P.

8(a)(2)).  Thus, the Court will dismiss any aspect of Claim IX challenging his current conditions

of confinement under the Eighth Amendment and the DTA.[8]

---

[8] The government also argues that the Court should enter judgment in its favor on the Eighth Amendment claim because the HVD designation is, in fact, reasonably related to a legitimate government interest.  <u>See</u> Mot. to Dismiss at 35.  It argues that the CIA has a legitimate interest in protecting any classified knowledge participants of the RDI program may have gained and "ensur[ing] that such classified information is protected from improper or unnecessarily widespread disclosure."  <u>Id.</u> at 29.  As such, HVDs are housed separately from non-HVDs at Guantanamo, and ███████████████████████████████████████████████████████████ .  <u>Id.</u> at 29–30.  These concerns about information security are also manifested in the different protective order protocols in cases concerning HVDs versus non-HVDs, including more rules about how HVDs communicate with their counsel. <u>Id.</u> at 30.  Other than some additional security measures like those described above, the government claims the conditions of confinement for HVDs and non-HVDs are similar:

> [b]oth camps ███████████ and have similar communal living conditions, in which detainees may freely interact with one another in communal spaces ███████████.  HVDs, like non-HVDs, have access to quality medical care and to legal correspondence.  Religious activity accommodations and camp privileges (such as access to television, a food pantry, and various forms of media), as well as disciplinary practices, are similar between HVDs and non-HVDs.  Relatedly, HVDs, like non-HVDs, ███████████████████, are permitted video family calls and written communications with family.

<u>Id.</u> at 31 (citations omitted).  The government represents that ███████████████████████████ ███████████████████████████████████████████████████  <u>Id.</u> at 31–32.  For his part, Bin Lep disagrees, claiming that "the creation and maintenance of the High-Value Detainee designation was done for . . . unlawful and improper purposes."  Opp'n at 37.

Unlike Claim X regarding Bin Lep's entitlement to an MMC, which was a pure legal issue, this claim involves mixed questions of law and fact.  Thus, the Court declines to decide this issue on the merits at this time.  But Bin Lep's habeas petition does not contain sufficient allegations to nudge his claims from conclusory to plausible and thus does not entitle him to further discovery and a decision on the merits.

     iii.   <u>Fifth Amendment Claims</u>

Bin Lep also challenges his HVD designation under the Fifth Amendment's due process clause.  Habeas Pet. ¶¶ 90–93.  It is not abundantly clear from the face of the pleadings and briefs whether Bin Lep mounts a procedural or substantive due process challenge; nor is it clear what process he claims was due and how the process he received was deficient (if it is a procedural challenge) or what liberty interest was at stake (if it is a substantive challenge).  <u>See</u> <u>id.</u>; Opp'n at 29.  It is even less clear whether he challenges his designation as an HVD or the factual predicate of his confinement in the first instance.  <u>See</u> Habeas Pet. ¶¶ 90–93; Opp'n at 29.  Moreover, whether and what process is due to a Guantanamo detainee is currently in flux: the issue of whether Fifth Amendment protections apply to Guantanamo detainees is currently pending before the en banc D.C. Circuit.  <u>See</u> <u>Al Hela v. Trump</u>, No. 19-5079 (D.C. Cir.); <u>see also</u> <u>Al Hela v. Trump</u>, 972 F.3d 120, 138–46 (D.C. Cir. 2020), <u>reh'g and reh'g en banc granted, judgment vacated sub nom.</u> <u>Al -Hela v. Biden</u>, No. 19-5079, 2021 WL 6753656 (D.C. Cir. Apr. 23, 2021).  Here, however, even assuming Bin Lep is entitled to the Fifth Amendment's full protection, he fails to plead facts sufficient to state such a claim.

To the extent Bin Lep challenges his HVD designation because his association with al Qaeda is not strong enough to warrant that classification, his argument is inapposite because the HVD classification is not based on "Petitioner's role in al-Qaida or his threat profile"; instead, "the relevant basis is the straightforward and historical fact that Petitioner was detained in the former RDI program—a fact that Petitioner readily admits."  Mot. to Dismiss at 36.  Thus, there is no "process" to challenge on those grounds.  And to the extent Bin Lep challenges the process of his designation as an enemy combatant and the conclusion that he was associated with al Qaeda— which served as the factual predicate for his confinement and his placement in the RDI program—

29

that claim overlaps with the issues at the heart of the ongoing military commission proceedings and thus should be held in abeyance pending the outcome of those proceedings.  See infra pp. 32–33.[9]

Also fatal to his claim (whether under a procedural or substantive theory), Bin Lep fails to allege a cognizable "liberty interest" of which he has been deprived.  The Supreme Court has held that "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement."  Wilkinson v. Austin, 545 U.S. 209, 221 (2005).  While such a liberty interest can be created by state regulation, Sandin v. Conner, 515 U.S. 472, 483–84 (1995) ("States may under certain circumstances create liberty interests which are protected by the Due Process Clause."), even if such a liberty interest has been created here (as to which the Court is doubtful, see Mot. to Dismiss at 38), such an interest must "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Sandin, 515 U.S. at 484.  As explained above, Bin Lep has not alleged any "significant hardship[s]" as a result of his HVD designation.  Put simply: "Petitioner does not have, and has never had, any right to assignment to a non-HVD facility."  Mot. to Dismiss at 38.

Insofar as Bin Lep alleges a substantive due process claim, he has not adequately pled another essential element of the claim: that the classification "is [not] reasonably related to legitimate penological interests."  Turner v. Safley, 482 U.S. 78, 89 (1987); accord Hatim v. Obama, 760 F.3d 54, 59 (D.C. Cir. 2014) (holding in a Guantanamo case challenging conditions of confinement that "Turner requires that we look to four factors to determine if these new policies are reasonable[, including] . . . whether there is a 'valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it'" (quoting Turner,

_____

[9] The fact that Bin Lep currently has the opportunity to challenge the factual predicate for his detention in his ongoing military proceedings undermines his Fifth Amendment procedural due process claim in any event.

482 U.S. at 89)).  As discussed above in the Eighth Amendment context, while Bin Lep makes a more detailed allegation as to the improper purpose of the HVD status in his briefs, he does not do so in his petition.  The petition merely states in conclusory fashion that the designation is "arbitrary" because it is not "based upon . . . anything he has done but on [the government's] decision to subject him to 'enhanced interrogation techniques.'"  Habeas Pet. ¶ 93.

But even taking this extremely bare-bones allegation as true, it is not enough to make out a substantive Fifth Amendment due process claim: the government's decision to subject him to "enhanced interrogation techniques" could be a reasonable basis for imposing the restrictions associated with his HVD status if, as the government claims, the exposure to those tactics in turn exposed Bin Lep to highly sensitive top secret information that could harm national security if compromised.  Moreover, as discussed above, even considering the color Bin Lep adds to this allegation in his brief, that would not elevate his claim out of the realm of pure speculation.  See supra pp. 27–28.  Thus, the Court will also dismiss any Fifth Amendment dimension of Claim IX for failure to state a claim.

### B.  Past Conditions of Confinement and Factual Predicate Underlying Detention

The government also argues that that Court should dismiss any aspects of Claim IX that relate to Bin Lep's past conditions of confinement because they are not cognizable habeas claims, or it should abstain from ruling on such issues because they overlap with the military commission proceedings.  See Mot. to Dismiss at 43–44.

Bin Lep opposes the government's arguments.  He again invokes the law of the case doctrine to argue that because the Court has already decided it has jurisdiction over Claim IX, the Court is bound by that decision here.  See Opp'n at 40–41.  But as discussed above, see supra p. 13 n.5, the Court is doubtful that it "decided" it had jurisdiction over Claims IX and X in any meaningful sense when it elected not to hold them in abeyance.  In any event, any dimension of

Claim IX challenging the underlying predicate for detention was not known to the Court at the time of the previous decision, so the law of the case is not applicable. See Bin Lep, 2022 WL 123957, at *15 (describing Claim IX as a challenge to his "designation as a High Value Detainee," which "has infringed many of his rights," without acknowledging any aspect of the claim that relates to past conditions of confinement or the factual predicate of his detention).

To the extent Bin Lep challenges the conditions of his confinement during the RDI program, that is not a cognizable basis for a habeas claim because he is no longer experiencing those conditions of confinement. See Aamer I, 742 F.3d at 1035 (noting that the relevant question in a habeas petition challenging conditions of confinement is whether "the conditions in which the petitioner is currently being held violate the law" (emphasis added)). The Court would not be able to fashion an appropriate habeas remedy on any aspect of Bin Lep's claim relating to past conditions, further demonstrating that it is not a claim over which the Court has subject-matter jurisdiction.

Regarding the aspect of Claim IX that challenges the factual predicate of his HVD designation, Bin Lep disagrees with the government's contention that when the Court decided not to hold Claim IX in abeyance in its previous decision, it did not appreciate the breadth of the claim and the extent to which it challenges the factual predicate supporting his placement in the RDI program in the first instance. See Opp'n at 41. He emphasizes that "[i]n declining to abstain, the Court noted that Petitioner had alleged that the 'designation imposes "significant burdens on his conditions of confinement" and that his designation is "based upon not anything he has done but on [the government's] decision to subject him to enhanced interrogation techniques."'" Id. (quoting Bin Lep, 2022 WL 123957, at *15). But the Court was not referencing any potential aspect of the claim that challenged Bin Lep's placement in the RDI program based on his level of

32

involvement in al Qaeda—it was making the point that Bin Lep's claim was broader than merely an "access to counsel claim," as the government contended.  Bin Lep, 2022 WL 123957, at *15. That is, as the Court explained, it did "not view this challenge to Bin Lep's designation as solely an access to counsel claim merely because that is one of several rights Bin Lep alleges the government has violated" but rather construed it to be "broader than respondents admit[ted]" because the claim "challenges Bin Lep's designation as a High Value Detainee and argues that this designation has infringed many of his rights."  Id.  Yet, when the Court made the decision not to hold Claim IX in abeyance, it did not consider the claim to concern Bin Lep's involvement in al Qaeda and his initial placement in the RDI program—the underlying conditions causing his HVD designation.

The Court has already held Bin Lep's seventh habeas claim—"that the government may not detain Bin Lep since he has never been a member of or substantially supported al Qaeda or an associated force engaged in hostilities against the United States or its coalition partners"—in abeyance because it "significantly overlaps with a question that the military commission will confront when ruling on statutory jurisdictional issues in the proceeding against him."  Bin Lep, 2022 WL 123957, at *15 (internal quotation marks omitted).  The same reasoning holds true here, to the extent Bin Lep challenges the "factual predicate"—his level of association with al Qaeda— for his status as an HVD.

Thus, the Court will dismiss for lack of jurisdiction any part of Claim IX that challenges his past conditions of confinement and hold in abeyance any aspect of the claim that challenges the factual predicate for his detention, his placement in the RDI program, or his subsequent HVD designation.

### III.    Discovery Motion

On March 14, 2022, Bin Lep also filed a motion for discovery to develop the record on Claims IX and X.  Disc. Mot. at 1.  Specifically, he seeks five categories of information: (1) exculpatory information, (2) conditions of confinement information, (3) high-value detainee policy, (4) his designation as a high-value detainee, and (5) the identities of possible witnesses. See id. at 3–11.

Because there are no live claims remaining in the habeas litigation after this decision—as discussed above, the Court will either dismiss, grant judgment in favor of the government, or hold in abeyance all aspects of Claims IX and X, and the remaining habeas claims are still held in abeyance pending the outcome of the military commission proceedings—no further discovery is appropriate at this time.  Hence, the Court will deny Bin Lep's discovery motion as moot or, as to any claims held in abeyance that still remain after the resolution of the military commission proceedings, as premature at this time.

### <u>Conclusion</u>

For the foregoing reasons, the Court will enter judgment in the government's favor as to Claim X; dismiss for failure to state a claim any aspect of Claim IX challenging current conditions of confinement; dismiss for lack of jurisdiction any aspect of Claim IX challenging past conditions of confinement; hold in abeyance any aspect of Claim IX that challenges the factual predicate for detention; and accordingly deny the discovery motion as moot or premature.  Hence—at least until the resolution of the military commission proceedings—there are no live claims remaining in this habeas litigation.  An Order consistent with this Memorandum Opinion will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated:   March 30, 2023